**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **ROSA ESTELA OLVERA JIMENEZ** | § | |
| | § | |
| **V.** | § | **A-12-CA-0373-LY** |
| | § | |
| **LORIE DAVIS** | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

TO:     THE HONORABLE LEE YEAKEL
        UNITED STATES DISTRICT JUDGE

The undersigned Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(e) of Appendix C of the Local Court Rules. Petitioner is represented by counsel and has paid the filing fee in this matter. Before the Court are Jimenez's Amended Application for Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 27), Respondent's Answer (ECF No. 32), and Jimenez's Reply (ECF No. 35).

This is the rare case in which justice and fundamental fairness require granting the petitioner a writ of habeas corpus. The judge who presided over the trial has explicitly stated that he had "serious doubts" about the verdict and that "there is a substantial likelihood that [Jimenez] was not guilty." He also stated that his confidence in the verdict was further undermined when he became aware of the expert testimony at the state court habeas proceedings. And the experienced former Court of Criminal Appeals and state district court judge who presided over the state habeas evidentiary hearing concluded that Jimenez did not receive a fair trial, and the jury's verdict would likely have been different had the experts from the habeas hearings testified at the trial. Despite this, the Texas Court of Criminal Appeals denied relief. In doing so, it failed to recognize the extent of defense counsel's errors and the significant reasons the jury's verdict is not worthy of confidence.

The Court of Criminal Appeals' decision is both contrary to federal law and involved the unreasonable, if not outright incorrect, application of that law. Its decision was also based on several factual determinations that were plainly unreasonable in light of the record before the state court.

Federal courts are required by statute to resolve habeas petitions "as law and justice require." 28 U.S.C. § 2243. "The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris v. Nelson*, 394 U.S. 286, 291 (1969). The central mission of the Great Writ is substantive justice. Today, as in prior centuries, the writ is a "bulwark against convictions that violate 'fundamental fairness.'" *Engle v. Isacc*, 456 U.S. 107, 126 (1982) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 97 (1977) (Stevens, J., concurring)). The correct application of clearly established federal law to this habeas petitioner's case requires granting her the writ.

## BACKGROUND

### A.     Factual Background

Respondent has custody of Jimenez pursuant to a judgment and sentence imposed by the 299th District Court of Travis County, Texas.[1] A jury found Jimenez guilty of felony murder and injury to a child, and sentenced her to concurrent terms of 75 years of imprisonment for the murder and 99 years of imprisonment for injury to a child. In this section 2254 habeas action, Jimenez asserts she was denied her right to due process of law and her right to the effective assistance of counsel, and that she is actually inocent of the crimes of conviction.

The Texas Court of Criminal Appeals summarized the facts of this case as follows:

---

[1]All cited page numbers reference the page numbers assigned by the ECF system, not any page number that may be contained on the filed document.

According to applicant, she was babysitting 21-month-old B.G.[2] when she saw him walking toward her and noticed that he was "limp and purple." After a neighbor called 911, paramedics arrived and extracted a "large mass" of "blood soaked" paper towels stuffed into B.G.'s throat. B.G. died three months later from brain damage due to the prolonged lack of oxygen during the choking. The court of appeals's (sic) opinion . . . summarized the theories of both the defense and the State:

> Jimenez's theory was that the entire incident was an accident. B.G. liked to play with paper towels and put things in his mouth. On the day in question, he put the paper towels in his mouth and accidentally swallowed them. Jimenez discovered B.G. choking, tried to help him in the bathroom (thus explaining the blood found there), and when she was unable to do so, immediately carried him to her neighbor's apartment. . . . The defense also portrayed Jimenez as a young pregnant woman who would not have been physically able to commit the crime of which she was accused. Additionally, the defense claimed that Jimenez's various explanations of the incident were largely consistent, and that any minor inconsistencies were the result of the trauma that she had just experienced and the fact that she did not have a proper understanding of the English language. Her possibly incriminating statements to Officer De Los Santos were also attributed to trauma and De Los Santos's aggressive questioning.[3]

---

[2]As the Texas Third Court of Appeals explained:

. . . B.G. [was] the 21-month-old child of Victoria Gutierrez. . . . Gutierrez testified that B.G. liked to play with objects in her kitchen . . . Gutierrez recounted how B.G. liked to "drop" the objects from the kitchen into the toilet. Gutierrez also explained that B.G. liked to play with paper and that he once placed an entire roll of toilet paper into the toilet. Gutierrez emphasized, however, that B.G. never put paper towels in his mouth.

*Jimenez v. State*, 240 S.W.3d 384, 387 (Tex. App.–Austin 2007, pet. ref'd).

[3] Detective De Los Santos interviewed Jimenez for six hours. She was twenty years old at the time, and seven months pregnant. During the interview she became aware that Child Protective Services had removed her one-year-old daughter, whom she was breast-feeding, from her home and her husband's custody. (ECF No. 25-1 at 97, 101; ECF No. 27 at 14, 22). The appellate court noted that:

[l]ater in the interview, Jimenez asked De Los Santos if she could speak with him "as a friend." . . . Unbeknownst to Jimenez, De Los Santos . . . recorded their conversation. The recording and a transcript of the recording were admitted into evidence. During the conversation, Jimenez asked De Los Santos, "If I were to tell you that I did it, what would happen?" De Los Santos answered that . . . there was a possibility that she would go to prison. Jimenez then asked about how long she could go to prison, and De Los Santos told

Jimenez also argued that the State's medical experts were biased in the State's favor because of the emotional nature of the case. Finally, Jimenez argued that her expert, Dr. Kanfer, provided testimony that the blood on the paper towels was primarily the result of pulmonary edema and that if the paper towels had been forced down B.G.'s throat, there should have been evidence of injury to the child's face or mouth and evidence that the paper towels had been shredded by the child's teeth.

The State's theory was that Jimenez had forced the wad of paper towels down B.G.'s throat. . . . The State's medical experts had testified that it was physically impossible for a 21-month-old child to place five paper towels down his throat, and that the child's gag reflex would prevent the child from accidentally swallowing such a large object. Furthermore, the State argued that Jimenez provided inconsistent explanations of how she found the child and that her statements to Officer De Los Santos were incriminating. . . .

*The resolution of this case depended primarily on expert testimony concerning whether B.G. could have stuffed the five wadded-up, double-ply paper towels into his mouth by himself and accidentally choked on them or whether that was "physically impossible," in which case applicant must have forced the wad down his throat.*

*Ex parte Jimenez*, 364 S.W.3d 866, 870-71 (Tex. Crim. App. 2012) (emphasis added), *quoting*

*Jimenez v. State*, 240 S.W.3d 384, 397-98 (Tex. App.–Austin 2007, pet. ref'd).

## B. State Court Proceedings

### 1. Trial

B.G. was injured on January 30, 2003, (ECF No. 24-1 at 7), and he died on April 27, 2003. (ECF No. 24-3 at 297). Jimenez was originally indicted for injury to a child. (ECF No. 25-1 at 87). On or about February 3, 2003, Leonard Martinez was appointed to represent Jimenez. (ECF No. 24-1 at 199). On March 6, 2003, Jimenez filed a motion to substitute counsel, indicating she had retained

---

her that he did not know. . . .

*Jimenez*, 240 S.W.3d at 393. Jimenez ultimately made no confession, and eventually she was escorted home and then arrested within the hour. (ECF No. 25-1 at 97).

Mr. Andarza as counsel. (ECF No. 24-1 at 201-02). However, the motion was withdrawn and Mr. Martinez remained on the case.[4] Mr. Martinez was assisted by Catherine Haenni and Jon Evans.[5] On November 4, 2004, Jimenez was re-indicted for felony murder and injury to a child. (ECF No. 24-1 at 7-8).

On June 3, 2003, defense counsel filed a motion to retain an expert witness on child behavior, citing *Ake v. Oklahoma*, 470 U.S. 68 (1985). (ECF No. 24-1 at 215-16). The record is silent regarding whether this motion was granted. On or about September 16, 2003, counsel filed separate motions to retain: an expert in child abuse and family violence, (ECF No. 24-1 at 243-44); a criminalist or forensic scientist, "like Dr. Henry Lee," (ECF No. 24-1 at 239-40);[6] a "simulation re-enactment expert," (ECF No. 24-1 at 247-48); and an expert in forensic medicine. (ECF No. 24-1 at 251-52). In the latter motion Mr. Martinez stated that "[c]ounsel needs assistance to prepare for the State's medical experts who will testify that the child could not have choked accidentally under the circumstances of this particular case." (ECF No. 24-1 at 251). None of these four motions cited *Ake*, identified the expert to be retained, or specified the amount of funding sought by counsel. And only one of the motions—that seeking funding for a forensic expert—was granted through a written

---

[4] Mr. Martinez states he was "initially appointed to represent Ms. Jimenez and then other counsel was retained. When other counsel and Ms. Jimenez' husband realized that other counsel could not handle the matter, this counsel resumed his representation . . . ." (ECF No. 25-2 at 5).

[5] Mr. Evans' involvement in the defense was "very limited." (ECF No. 25-2 at 4). As Mr. Martinez explained, "he volunteered to assist just weeks before trial and had not had a chance to attend defense strategy and brainstorming meetings with Ms. Haenni, the investigators, the experts, and me." (*Id.*).

[6] Henry Lee is a forensic scientist who has testified as an expert witness in a number of notorious criminal cases, including the O.J. Simpson trial. Mr. Martinez's fascination with experts who had been involved in notorious cases, as well as his fascination with the documentary that was being filmed during the trial of this case, appears throughout the record.

order, though even that order does not specify the amount of funding granted. (ECF No. 24-1 at 254). There are no orders in the the record granting or denying any of the other motions.

Jimenez's trial began August 22, 2005. (ECF No. 24-3 at 1). A documentary film crew was in the courtroom during most of the trial. (ECF No. 24-3 at 44). Jimenez did not testify at her trial. (ECF No. 24-8 at 28). The defense strategy was to discredit the State's theory that Jimenez killed B.G. "while under stress." (ECF No. 25-2 at 7-8.). The defense also sought to disprove the State's theories that Jimenez tried to make "the death look like an accident," and that she did not seek help until B.G. had been dead for "at least 20 minutes to 40 minutes." (*Id.*). The defense team decided "to put on character evidence that showed [Jimenez] was not the type of person who would abuse a child," by showing Jimenez was a "peaceful, calm, caring" person. (ECF No. 25-2 at 8).

The following summation of the medical and expert witness testimony presented to the jury is taken from the Court of Criminal Appeals' opinion in the state habeas action:

> At trial, Dr. John Boulet testified that he was a board-certified pediatric emergency physician who first treated B.G. at the hospital. He stated that he saw the wad of paper towels that had been removed from B.G.'s throat, and that it was nearly the size of his own fist. In his opinion, an object of that size could not go down a child's airway accidentally; "it would have to be put down there."
>
> Dr. Patricia Oehring testified that she is a pediatric critical-care physician. She was B.G.'s primary doctor once he was moved from the emergency room to the intensive care unit. When shown a photograph of the wad of paper towels, she said that it was not possible for B.G. to put this wad down his throat all by himself. . . .
>
> ***
>
> Dr. Elizabeth Peacock, a forensic pathologist and deputy medical examiner, testified that B.G.'s death was a homicide caused by damage to the brain from a lack of oxygen. This finding was "not a close call" because "the physics of it [being an accidental death] are impossible." . . .
>
> ***
>
> The defense expert, Dr. Ira Kanfer, is a forensic pathologist and medical examiner. In his opinion, B.G.'s choking was accidental. He believed that B.G. would have been able to wad up the paper towels himself, stuff them into his mouth,

and accidentally swallow them. He explained that he had conducted an experiment to test this theory by wadding up five paper towels, soaking them in water, and compressing them into a ball small enough to fit into a toddler's mouth and throat.

Dr. Kanfer explained that, if someone had forced five paper towels down B.G.'s throat, there should have been some evidence of trauma "around the cheeks, the lips, the teeth, [or] a cut gum". . . Furthermore, B.G.'s teeth would have ripped the paper towels to shreds as someone tried to force them past his teeth. Dr. Kanfer said that the absence of any evidence of bruising and shredded towels was "crucial" to the investigation and expert conclusions.

Dr. Kanfer also thought that the blood found on the towels was consistent with pulmonary edema. . . .

***

The defense also called Dr. Randall Alexander, a board-certified pediatrician, as a hostile witness.[7] Dr. Alexander agreed with Dr. Kanfer that, if a child's airway is completely occluded, his heart would not continue to beat for an hour, and that pulmonary edema might (or might not) occur when one's airway is blocked. However, on cross-examination, Dr. Alexander largely agreed with the testimony of the treating doctors.

*Ex parte Jimenez*, 364 S.W.3d at 871-73.

During the State's cross-examination of Dr. Kanfer, the prosecutor emphasized Dr. Kanfer's lack of credentials,[8] his lack of board certifications or membership in professional organizations,[9]

---

[7] Dr. Alexander, a professor of pediatrics at the University of Florida and an expert on child abuse, was an expert witness for the State. (ECF No. 24-7 at 5, 175-78). Though it is not entirely clear from the record, it appears that the defense agreed to allow Dr. Alexander to testify out of order, after the State rested. Dr. Alexander became available to testify while Dr. Kanfer was still on the stand, and Mr. Martinez wanted to complete the presentation of Dr. Kanfer's testimony after Dr. Alexander. Ms. Wetzel, on the other hand, preferred to complete Dr. Kanfer's testimony before Dr. Alexander testified. While counsel argued about the issues, Mr. Martinez decided he would resolve matters by calling Dr. Alexander himself. (ECF No. 24-7 at 171-72).

[8] The prosecutor noted Dr. Kanfer did not bring either a resume or curriculum vitae to court, which he explained was "[p]robably an oversight." (ECF No. 24-7 at 106). Dr. Kanfer also allowed that he had no specialized training or experience in the specialty of child abuse, although he had performed autopsies on victims of child abuse. (ECF No. 24-7 at 118-21).

[9] Dr. Kanfer testified: "[Y]ears ago I was a member of multiple professional organizations, but the fees just like the licenses become prohibitive . . . I'd rather have the money in my pocket. . . ." (ECF No. 24-7

and his lack of peer-reviewed publications.[10] The prosecutor inferred Dr. Kanfer did not conduct a

sufficient investigation of the case to support his opinion that B.G. had accidentally choked on the

paper towels. (ECF No. 24-7 at 110-11). The prosecutor also insinuated Dr. Kanfer was essentially

a hired gun for criminal defendants. (ECF No. 24-7 at 117).   And then, on cross-examination, the

following exchange took place:

> Q      And you're just here as a completely unbiased expert to educate the jury.
> A      Exactly.
> Q      Is that why on the break you made the statement that they, referring to [co-counsel] and myself, could go fuck ourselves?
> A      Right. That's an exactly correct quote.
> Q      Okay. Thank you, sir. That's very helpful.

(ECF No. 24-7 at 151).

Incredibly, Jimenez's counsel did not object, but instead asked the court, "Your Honor, do

you want to have lunch, or do we – can I continue? . . ." *Id.* Nor did he raise the issue outside the

presence of the jury during the subsequent break, or request any curative instruction.  Upon resuming

her questioning of Dr. Kanfer (after the interruption of Dr. Alexander's testimony) Ms. Wetzel again

had Kanfer admit that he had told the prosecutors to go "fuck themselves." (ECF No. 24-7 at 298).

Only then did Mr. Martinez object, complaining the prosecutors should be prohibited from "getting

into the personal thing any more." *Id.* The prosecutor responded that her questioning was "relevant

to [Dr. Kanfer's] bias." *Id.* The objection was overruled. (ECF No. 24-7 at 299). After questioning

Dr. Kanfer about Dr. Alexander's testimony, the prosecutor again came back to his use of profanity,

---

at 111-12).

[10] Dr. Kanfer testified he had published "five or six abstracts," titled: "Unusual Modes of Suicide in Connecticut," "Peppers and Mushrooms," "Unusual Patterned Injury in a Motor Vehicle Accident," "The Failure to Buckle Up," and "How to Turn a Homicide into an Accident." (ECF No. 24-7 at 113).

again without objection. (ECF No. 24-7 at 304). To make matters worse, Dr. Kanfer also spontaneously used the phrase "goddamn" at least three times in his testimony.[11]

The jury was instructed as to felony murder, criminally negligent homicide, and injury to a child. (ECF No. 24-1 at 66-70). After deliberating for approximately seven hours, the jury returned a verdict of guilty on both felony murder and injury to a child, and found Jimenez used a deadly weapon, i.e., a paper towel, in the commission of the murder. (ECF No. 24-1 at 71-73, 182). The jury assessed punishment at a term of 75 years of imprisonment on the murder charge, and the maximum term of 99 years of imprisonment on the charge of injury to a child. (ECF No. 24-1 at 78, 80).

Jimenez filed a motion for a new trial. (ECF No. 24-1 at 113-20). Jimenez argued there was insufficient evidence to support the verdict, that the prosecution committed misconduct during closing argument, and that the State sequestered witnesses from the defense. (ECF No. 24-1 at 115-16). After the new trial motion was filed, Kristin Etter, assisted by Keith Hampton, was appointed as Jimenez's appellate counsel. (ECF No. 24-1 at 126, 145). Ms. Etter filed an amended motion for new trial, which "jettisoned a number of claims" asserted by trial counsel, and added a claim that Jimenez's trial counsel rendered ineffective assistance. (ECF No. 24-1 at 148-52, 155-58; ECF No. 24-11 at 16-17).

The trial court conducted a hearing on the motion for a new trial. (ECF No. 24-11). Terry Kirk, an experienced criminal defense attorney and an expert on ineffective assistance of counsel

---

[11] In the first instance, he is commenting on what the paper towel wad would look like if it had been removed in the manner the EMT testified, noting that it would have "come out in a goddamn roll." (ECF No. 24-7 at 287). In the next two instances, he is recounting a case he had worked on involving a man who died after falling from a small plane, and noted that the subject "has his heart attack, the plane flips over, and he falls out of the goddamn plane . . . and about a half a mile away we find the goddamn plane." (ECF No. 24-7 at 294-95).

claims, testified at the hearing. (ECF No. 24-11 at 41-42). Mr. Kirk opined Mr. Martinez's trial performance deprived Jimenez of her right to the effective assistance of counsel. Mr. Kirk faulted Mr. Martinez for choosing an expert who wrote an article called "How to Turn a Homicide Into an Accident," explaining that "obviously he loses all credibility the second a very capable prosecutor or even a prosecutor, period, points it out." (ECF No. 24-11 at 56). Mr. Kirk also opined that "[Jimenez] was doomed from the minute Mr. Martinez took over the case. He's what we call a V-6, a violation of the Sixth Amendment. Walking violation." (ECF No. 24-11 at 57). The trial judge summarily denied the new trial motion on November 14, 2005. (ECF No. 24-1 at 171).

## 2. Direct appeal

Jimenez filed a direct appeal and, for the second time, Mr. Martinez reentered the case after being substituted out. With Jimenez's approval, Mr. Martinez sought leave to reenter the case as appellate counsel, in place of Ms. Etter. (ECF No. 24-1 at 348; ECF No. 25-2 at 2). Mr. Martinez averred this was because Ms. Etter had "jettisoned" legitimate claims and Mr. Kirk had made "very derogatory remarks" about him during the motion for a new trial proceedings. (ECF No. 25-2 at 4). The motion was granted. (ECF No. 24-1 at 351). Mr. Martinez's co-counsel on the appeal was Karyl Krug. (ECF No. 25-2 at 2).

In the appeal Jimenez challenged the legal and factual sufficiency of the evidence supporting her convictions, and argued the prosecutor engaged in misconduct. Mr. Martinez dropped the claim that he had been ineffective, but added an ineffective assistance of counsel claim against Ms. Etter. *Jimenez*, 240 S.W. 3d at 387. The Third Court of Appeals denied relief, concluding the evidence was both legally and factually sufficient to support Jimenez's convictions and that none of the alleged acts of prosecutorial misconduct denied Jimenez a fair trial. *Id.* at 402-12. The Texas Court of

Criminal Appeals denied a petition for discretionary review. *Ex parte Jimenez*, 364 S.W. 3d at 870. Jimenez's petition for a writ of certiorari was denied. *Jimenez v. Texas*, 555 U.S. 892 (2008).

### 3. State habeas proceedings - trial court

On October 6, 2009, Jimenez, through Ms. Krug, filed an application for a state writ of habeas corpus. (ECF No. 25-1 at 3-26, 29-144). Jimenez asserted a claim the appellate court had found potentially meritorious, her claim of prosecutorial misconduct with regard to the prosecutor's comment during closing argument about alleged bite marks on Jimenez's hand. (ECF No. 25-1 at 10; *see also Jimenez*, 240 S.W.3d 413-14). Jimenez also argued she was denied due process of law and a fair trial based on the behavior of trial counsel and the prosecutors:

> Applicant's only scientific expert witness at trial was destroyed by the prosecutor, with at least some assistance from defense counsel . . . This was a high profile case that was made into an award-winning documentary called "Mi Vida Dentro [My Life Inside]," and the consciousness of that by the lawyers in this case seemed to put everyone on their worst behavior. Trial counsel became very emotional and failed to object to anything. . . . This was more like a free-for-all than a trial.

(ECF No. 25-1 at 23). Jimenez further asserted she was denied the effective assistance of counsel because Mr. Martinez's performance deprived her of "the effective use of an expert to which [she] was constitutionally entitled," citing *Ake v. Oklahoma*. (ECF No. 25-1 at 20, 23). Bryce Benjet, Jimenez's federal habeas counsel, was substituted as counsel in Jimenez's state habeas action ten months after the initial application was filed. (ECF No. 25-3 at 1-4). Approximately five weeks later Mr. Benjet docketed a supplemental application, asserting Jimenez was actually innocent, as shown by new evidence. (ECF No. 25-3 at 6-111). Jimenez further argued she was denied the necessary funds for adequate expert assistance, citing *Ake v. Oklahoma.* (ECF No. 25-3 at 15, 58-59). Mr.

Benjet also raised a number of ineffective assistance of counsel claims, including a claim that defense counsel had been deficient in the handling of the experts witnesses.

The amended petition included a number of affidavits from medical experts, including that of Dr. Dunham, a pediatric otolaryngologist with experience in treating "children with foreign bodies in their aerodigestive tracts." (ECF No. 25-5 at 91-93). Dr. Dunham noted a recent incident of a child choking on a piece of bread that "may have been wider than this wad of paper towel." (ECF No. 25-5 at 93). As to the lynchpin of the prosecution's case—the claim that it was "physically impossible" for B.G. to have put the paper towels into his own mouth—Dr. Dunham opined that "there is no way in good conscience that I, or any qualified medical professional, could reliably say that the injury in [B.G.'s case] had to be an intentional attack based on the size of the wad of paper towel." *Id.*

Also attached to the supplemental petition were the affidavits of additional experts on the subject of pediatric airways and choking: Dr. Zur, a pediatric critical care and airways specialist (ECF No. 25-3 at 75-82); and Dr. McCloskey, a pediatric critical care physician, who had "seen first-hand instances of accidental ingestion of foreign bodies in the airway and where an airway was obstructed as a result of confirmed child abuse." (ECF No. 25-3 at 83-89). Dr. Ophoven, a pediatric forensic pathologist with thirty years of training and experience, also submitted an affidavit. (ECF No. 25-3 at 90-98).[12] Dr. Zur and Dr. Ophoven stated they would have testified at Jimenez's trial that it was likely B.G.'s injury was an accident, had they been asked to do so. (ECF No. 25-3 at 82, 90).

---

[12] The Court takes judicial notice of the amicus briefs filed in support of Jimenez's petition for a writ of certiorari. *See* FED. R. EVID. 201(b). One amicus brief states: "After her conviction, private individuals and the government of the State of Mexico hired new lawyers to prepare [Jimenez's] state habeas application and paid for assistance from qualified experts – which the trial court and her trial attorney's errors had denied her." *Jimenez v. Texas*, No. 12-117, *Brief of Enrique Peña Nieto, Governor Eruviel Ávila Villegas, Yuriria Marvàn, and the Free and Sovereign State of Mexico as Amici Curiae Supporting Petitioner*, 2012 WL 3756877 at *1.

These experts persuasively undermined the medical testimony presented by the prosecution at trial. For example, Dr. Ophoven stated that the medical opinions "offered at trial were unreliable," adding "I was struck by the level of speculation . . . none of the experts in the case had the necessary training and experience, or consulted with persons with this specialized knowledge, in order to give a reliable opinion. . . ." (ECF No. 25-3 at 94). She believed Dr. Peacock's testimony that it was "physically impossible" for B.G. to have accidentally choked was "based entirely on speculation. Such speculation is shocking and inappropriate . . ." (ECF No. 25-3 at 96).

Mr. Martinez submitted two affidavits in the course of Jimenez's state habeas action. The first is quite lengthy, and also quite defensive. Mr. Martinez described the allegations of ineffective assistance of counsel as "character assassination," and claimed that the allegations were the result of a personal dispute between himself and Ms. Krug. (ECF No. 25-2 at 2). He further declared:

> [W]e do not have the type of funds that give us the luxury of getting anyone we want. . . . getting funds and finding experts is no easy task. Counsel spent inordinate hours looking for experts willing to take a court appointed case. Most experts were unwilling to accept the low pay and then have to wait until the future to be paid. Assurances did not work and even offering to pay expenses out of my own pocket did not work either. This counsel remains convinced this case was a failure in forensics, strategy decisions notwithstanding.

(ECF No. 25-2 at 11). Approximately seven months after submitting this affidavit, after Mr. Benjet filed Jimenez's supplemental habeas application, Mr. Martinez filed a supplemental affidavit, stating:

> 4. In my prior affidavit, I did not describe the procedures used for obtaining court funds for expert assistance. In Ms. Jimenez's case, I used the same informal procedures that I had used for over 20 years in handling indigent criminal appointments in Travis County.
>
> *5. My general procedure was this. Once I identified a need for an expert, I would meet with [the] judge ex parte in chambers. I would explain to the judge my need for*

*the expert and approximately what I believed the expert would cost. If the judge decided to authorize payment, I would then file a motion requesting expert assistance that would simply state my need for the expert. This motion would be granted, as authorized in the prior ex parte conversation in chambers.*

6. I followed this procedure in Ms. Jimenez's case, and Judge [Wisser] authorized payment for the experts and investigators that I used in the trial. *But as explained in my prior affidavit, the expert assistance I had at trial was not sufficient to adequately defend Ms. Jimenez.*

7. During my pre-trial preparations, I met with Judge [Wisser] to ask for additional funds to retain experts such as Dr. McGeorge and a biomechanical expert. I explained to the judge why we needed these experts, and that I did not think that my current team was adequate to counter the State's case. Judge [Wisser] told me that he had authorized more experts than usual in a noncapital case, and that he would not pay for any more expert assistance regardless of my need. Based on the judge's ruling, I was forced to work within the constraints imposed by the Court. Ms. Jimenez was indigent, and I could not afford to hire these experts out of pocket.

(ECF No. 25-3 at 110) (emphasis added).

The state trial court conducted hearings on Jimenez's habeas claims. (ECF No. 25-7 & ECF No. 25-8). The following summation of the evidence presented at those hearings is taken from the Court of Criminal Appeals' decision denying Jimenez a state writ of habeas corpus:

> . . . During the habeas proceedings, applicant presented the live testimony of two pediatric specialists from the Children's Hospital of Philadelphia, Dr. Karen Zur, a pediatric otolaryngologist, and Dr. John McCloskey, a pediatric anesthesiologist and critical-care specialist. She also submitted an affidavit from Dr. Janice Ophoven, a pediatric forensic pathologist. *These were all highly qualified experts who based their opinions upon a scientific methodology, and their opinions were supported by scientific data as well as familiarity with the facts of this case.*
>
> They, like Dr. Kanfer, questioned the reliability of the conclusions offered by the two doctors who had cared for B.G., Dr. Alexander (whom applicant had called as a hostile witness) and the two medical examiners who had testified at trial. These new experts, like Dr. Kanfer, testified that B.G.'s injury was likely due to an accidental choking. *Their credentials were even more impressive than those of Dr. Kanfer and their examples even more vivid and detailed than his.* They, like Dr. Kanfer, presented an eminently plausible theory of how B.G. could have accidentally choked on a wet wad of paper towels.

14

. . . Some of the original witnesses from the trial also testified during the habeas hearing, including the EMT who removed the wad of towels from B.G.'s throat, Dr. Oehring . . . the treating pediatric critical-care doctor, and Dr. Peacock, the forensic pathologist. Dr. Alexander—the consulting pediatrician—submitted an affidavit. They all reaffirmed their trial testimony. The State also called Dr. James Eskew, an otolaryngologist like Dr. Zur, who stated that he did not believe that B.G. accidentally choked on the wad of paper towels. He, like Drs. Boulet, Oehring, Peacock, Parungao, and Alexander, did not believe it likely that a child could wad up paper towels of this size and put that wad down his throat.[13]

*Ex parte Jimenez*, 364 S.W.3d at 874-76 (emphasis added).

After hearing extensive evidence, the state habeas trial judge, Judge Baird, issued findings of fact and conclusions of law, and recommended the Texas Court of Criminal Appeals grant Jimenez a new trial. (ECF No. 25-6 at 51-69). Judge Baird concluded that Jimenez's "trial was fatally infected with constitutional error." (ECF No. 25-6 at 49). Judge Baird further concluded Jimenez's due process rights under *Ake v. Oklahoma* were violated because she was denied adequate funding to hire experts. (ECF No. 25-6 at 48). He also determined Mr. Martinez was ineffective because he failed to retain qualified experts and failed to make an "adequate request" for such experts, and he failed to adequately respond to Dr. Kanfer's "outrageous behavior . . . by objection, request for a mistrial, or request for a continuance." (ECF No. 25-6 at 46, 48). Judge Baird also concluded that "the statements by the prosecution [during closing argument] referring to bite marks violated Ms. Jimenez's due process rights under *Giglio* and *Napue*." (ECF No. 25-6 at 49).

---

[13] The inclusion of Dr. Parungao in this list is factually incorrect. He was the pathologist who performed the autopsy, and he did not testify that B.G. could not have put the paper towels down his throat. Dr. Parungao testified: "Whatever information I got at the time, I decided that based like somebody put something in his mouth." (ECF No. 24-7 at 163). In fact, Dr. Parungao told the defense investigator he specified "homicide" as the manner of death because "he received information from either the police or the media that led him to believe—that told him that it was a homicide." (ECF No. 24-8 at 9). Dr. Parungao told the defense investigator that B.G. was choked to "keep him quiet." (ECF No. 24-8 at 9). However, a neighbor testified it was "not difficult" to hear "what happens in neighbors' apartments," and that she did not hear crying coming from Jimenez's apartment prior to the incident. (ECF No. 24-6 at 21).

## 4.     State habeas - Court of Criminal Appeals

The Court of Criminal Appeals declined to adopt Judge Baird's recommendation. It declined to consider one claim and rejected four others.  First, it found Jimenez's *Ake* claim procedurally defaulted, and thus declined to address it. *Ex parte Jimenez*, 364 S.W. 3d at 882. It also  rejected the claim that Mr. Martinez was ineffective with regard to his preparation to address the primary issue of whether the choking was intentional or accidental. *Id.* at 884. Next, it rejected the claim that Mr. Martinez was ineffective by selecting Dr. Kanfer to be his expert witness. *Id.* at 885-86. Third, it found no ineffective assistance for counsel's handling of the cross-examination regarding Dr. Kanfer's "go fuck yourselves" comment to the prosecutors. *Id.* at 886-87. And last, it rejected the ineffective assistance claim based on Mr. Martinez's "failure to file a written *Ake* request for additional funding to retain more experts."  *Id.* at 888.

In rejecting this last claim, however, the Court of Criminal Appeals did not make a finding that Mr. Martinez had met the standard of care with regard to his expert motions; in fact, it noted that Mr. Martinez did *not* file proper written *Ake* motions.[14]  As already discussed, because Mr. Martinez did not file adequately-supported written expert motions or obtain on-the-record denials of those motions, the Court of Criminal Appeals declined to address the merits of Jimenez's *Ake* claim. *Id.* at 880-82. Thus, although it never explicitly states that Mr. Martinez's performance in this regard was unconstitutionally deficient, the Court of Criminal Appeals necessarily found his failure to

---

[14]After summarizing the "informal" method Mr. Martinez claimed to have used to obtain approval for experts, the Court of Criminal Appeals states: "But *Ake* does not authorize such an informal methodology in seeking expert assistance, and such an off-the-record informal meeting will not itself preserve a claim to the entitlement of expert assistance for judicial review by the appellate courts in Texas either on direct appeal or habeas review." 364 S.W.3d at 881. The appellate court noted: "In *Williams*, we reiterated the importance of presenting affidavits or other information to the trial judge in making the required threshold showing."*Id.* at 882.

"preserve [Jimenez's] constitutional claim in the trial court by filing a proper written *Ake* motion and

ensuring that the trial judge formally ruled on it," *id.* at 882, fell short of prevailing professional

norms of attorney performance. The Court of Criminal Appeals nevertheless rejected the claim—not

because it believed Mr. Martinez performed effectively, but because it concluded there was no

prejudice to Jimenez—because, in the court's words, "Applicant has not shown that, if his [sic]

attorney had retained (or requested funding for) more experts to testify to the same theory, the result

of the trial likely would have been different." *Id.* at 888.

After the Court of Criminal Appeals denied Jimenez the writ, Judge Wisser, who had

conducted the criminal trial and was then retired, sent a letter to the Travis County District Attorney,

stating:

> . . . While I still feel that the defendant received a fair trial, and had competent
> representation, I believe now, as I did at the time of the trial, that there is a substantial
> likelihood that the defendant was not guilty of this offense. I do believe that a
> reasonable jury could and did convict her, based on the evidence presented at trial *but
> I have serious doubts about their verdict*.

(ECF No. 25-9 at 333) (emphasis added). Judge Wisser opined that "the defense was significantly

'out-lawyered.'" *Id.* He added that "[t]he experts that the defense produced at the writ hearing have

increased my concerns that the death of the child was an accident and not a homicide. *This new

evidence undermines my confidence in the verdict that was rendered at Ms. Jimenez's trial.*" (ECF

No. 25-9 at 334) (emphasis added).

The Supreme Court denied Jimenez's petition seeking a writ of certiorari from the Court of

Criminal Appeals' decision denying habeas relief. *Jimenez v. Texas*, 568 U.S. 1085 (2013). Jimenez

then filed a second application for a state writ of habeas corpus. (ECF No. 10 at 1). The Texas Court

of Criminal Appeals dismissed this petition on or about April 21, 2014. (ECF No. 12 at 1). On

February 24, 2016, the Texas Court of Criminal Appeals dismissed a third application for a writ of habeas corpus as successive. (ECF No. 32-1 at 5).

## C.     Federal Habeas Proceedings

Jimenez timely filed her application for a federal writ of habeas corpus. (ECF No. 1). The Court abated the case while a petition for certiorari was pending. (ECF No. 7). The case was re-opened in February of 2013, but stayed on May 10, 2013. (ECF Nos. 9 & 11). The stay was lifted on March 31, 2016. (ECF No. 19). Jimenez's amended petition was filed August 22, 2016. (ECF No. 27). Jimenez raises the following claims in her request for federal habeas relief:

1.     She was denied the effective assistance of counsel, because counsel failed to retain a "qualified and appropriate expert," and because counsel failed to preserve her *Ake* claim;

2.     She was denied the effective assistance of counsel because counsel failed:

   (a)     to object to the introduction of the probable cause and search warrant affidavits;
   (b)     to object to the State's experts' testimony;
   (c)     to "mitigate the harm from Dr. Kanfer's meltdown;"
   (d)     to object to the prosecution's statement in closing argument about the odontologist and alleged bite-marks on Jimenez's hand;

3.     She was denied her right to due process of law by the cumulative effect of her counsel's failures;

4.     She is entitled to relief pursuant to the holding in *Ake v. Oklahoma*; and

5.     She is actually innocent of the crimes of conviction.

(ECF No. 27 at 2-3). The State agrees Jimenez's petition is timely and not successive, and that Jimenez exhausted her claims in the state courts. (ECF No. 32 at 15).

## STANDARD OF REVIEW

### A.    The Antiterrorism and Effective Death Penalty Act

In *Harrington v. Richter* the Supreme Court summarized the basic principles established by

the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA"), codified at 21 U.S.C. § 2254.

562 U.S. 86, 97-100 (2011). Section 2254(d)(1) permits the granting of federal habeas relief when

the state court's decision "was contrary to" federal law, or involved an "unreasonable application"

of such law. Section 2254(d)(2) permits the granting of relief when the state court's decision "was

based on an unreasonable determination of the facts" in light of the record before the state court.

*Richter*, 562 U.S. at 100 (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court

arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the

state court decides a case differently than the Supreme Court on a set of materially indistinguishable

facts. *Thaler v. Haynes*, 559 U.S. 43, 47 (2010). Under the unreasonable application clause, a federal

court may grant the writ if the state court identifies the correct governing legal principle from the

Supreme Court's decisions, but its application of that principle to the facts of the prisoner's case is

objectively unreasonable. *White v. Woodall*, 572 U.S. 415, 419-20 (2014). A reviewing federal court

presumes the state court's factual findings are sound unless the petitioner rebuts the "presumption

of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Miller-El v. Dretke*, 545

U.S. 231, 240 (2005).

> Deciding whether a state court's decision "involved" an unreasonable application of
> federal law or "was based on" an unreasonable determination of fact requires the
> federal habeas court to train its attention on the particular reasons—both legal and
> factual—why state courts rejected a state prisoner's federal claims . . .

*Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018) (some internal quotations omitted).

A state court's determination that a claim lacks merit precludes federal habeas relief under subsection 2254(d) unless "fairminded jurists could disagree" on the reasonableness of the state court's decision. *Richter*, 562 U.S. at 101. When the last state court to decide a petitioner's federal claim explains a decision on the merits in a "reasoned opinion," the federal court must "simply review" the reasons given by the state court and defer to the state court's decision if it is "reasonable." *Wilson*, 138 S. Ct. at 1192. *See also McWilliams v. Dunn*, 137 S. Ct. 1790, 1800-02 (2017) (granting relief on the petitioner's *Ake* claim and holding a federal habeas court may grant relief only when there is a "reasonable dispute" that the state court's decision was wrong).

Although the AEDPA standard is demanding, it is not insurmountable. *Miller-El v. Dretke*, 545 U.S. at 240; *Chester v. Thaler*, 666 F.3d 340, 344 (5th Cir. 2011); *Soffar v. Dretke*, 368 F.3d 441, 479 n.41 (5th Cir. 2004) (collecting Fifth Circuit Court of Appeals cases finding meritorious *Strickland* claims). The deference required by the AEDPA does not imply abandonment of federal habeas review and it does not preclude relief. *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015).

> At the core of [the power to grant writs of habeas corpus] is the federal courts' independent responsibility—independent from its coequal branches in the Federal Government, and independent from the separate authority of the several States—to interpret federal law. A construction of AEDPA that would require the federal courts to cede this authority to the courts of the States would be inconsistent with the practice that federal judges have traditionally followed in discharging their duties under Article III of the Constitution.

*Williams*, 529 U.S. at 378-79.

A federal habeas court can disagree with a state court's determination of federal law and conclude that the state court's decision was unreasonable, or that the factual premise for the state court's decision has been shown to be incorrect by clear and convincing evidence. *Miller-El v.*

*Dretke*, 545 U.S. at 241-53; *Miller-El v. Cockrell*, 537 U.S. 322, 340-41 (2003); *Skinner v. Quarterman*, 528 F.3d 336, 344-45 (5th Cir. 2008); *Reed v. Quarterman*, 504 F.3d 465, 491-92 (5th Cir. 2007). In the event the state court adjudication is deemed unreasonable, the federal court must determine de novo whether habeas relief is appropriate. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

**B.     The *Strickland* Standard**

The "very premise" of the American system of criminal justice is the defendant's entitlement to an adversarial process, because "partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Bell v. Cone*, 535 U.S. 685, 716 (2002) (internal quotations omitted). The guarantee of an adversarial process includes a defendant's "meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotations omitted). And the effective assistance of trial counsel is crucial to the adversarial system and the presentation of a complete defense. Claims of ineffective assistance of counsel are analyzed under the well-settled standard set forth by the Supreme Court in *Strickland v. Washington*:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant can make both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. 668, 687 (1984).

With regard to the deficiency prong of the test, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. The

"right to effective assistance of counsel . . . may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). *See also Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986) ("[A] single, serious error may support a claim of ineffective assistance of counsel. . . ."). The prejudice prong requires the petitioner to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

"[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id.* at 698. *See also Nobles v. Johnson*, 127 F.3d 409, 418 (5th Cir. 1997). Whether counsel made a decision to pursue a particular trial strategy is a question of fact and whether that strategy was reasonable is a question of law. *Wood v. Allen*, 558 U.S. 290, 301, 304 (2010); *Trottie v. Stephens*, 720 F.3d 231, 244 (5th Cir. 2013). Although counsel's choice of trial strategy is presumed reasonable unless clearly proven otherwise, *Strickland*, 466 U.S. at 689, the Court is not required to condone unreasonable decisions masquerading as strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no logical strategic decision. *Richards v. Quarterman*, 566 F.3d 553, 564, 566-67 (5th Cir. 2009).

## ANALYSIS

On at least two of Jimenez's claims, the Court of Criminal Appeals' decision is contrary to federal law and involved the unreasonable, if not incorrect, application of that law. Further, its conclusions on these two claims were based on several factual determinations that were plainly unreasonable in light of the record before the state court. When correctly applied, the law requires that Jimenez be granted a writ of habeas corpus on these two claims.

## A. Ineffective Assistance in Failing to Preserve the *Ake* Claim

As previously noted, the Court of Criminal Appeals rejected Jimenez's claim that her trial counsel rendered ineffective assistance by failing to preserve her *Ake* claim. The Court of Criminal Appeals rejected this claim not because it found counsel's performance sufficient, but because it concluded Jimenez had failed to show that if her counsel had "retained (or requested funding for) more experts to testify to the same theory [as Dr. Kanfer], the result of the trial likely would have been different." *Ex parte Jimenez*, 364 S.W.3d at 888.

### 1. The Court of Criminal Appeals' central fact finding was unreasonable in light of the record

The Fifth Circuit has explained two separate sections of the AEDPA apply when reviewing the factual determinations a state court has made on a habeas petition:

> Relief is warranted under § 2254(d)(2) if the state court's "adjudication of the claim . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The second provision, § 2254(e)(1), provides that a state court's factual findings are presumed to be correct, unless the petitioner rebuts them with clear and convincing evidence.

*Fields v. Thaler*, 588 F.3d 270, 273 (5th Cir. 2009) (emphasis added).[15] A state appellate court's failure to consider key aspects of the record is a defect in the fact-finding process. *Miller-El v.*

---

[15] With regard to the facts underpinning its decision, the Court of Criminal Appeals stated that "although we agree with some of the habeas judge's factual findings, we do not adopt them all because some of them are not supported by both the trial and habeas records." *Ex Parte Jimenez*, 364 S.W.3d at 870. Judge Baird made 12 single-spaced pages of factual findings. (ECF No. 25-6 at 52-63). Even though the findings are separately numbered and segregated from the legal conclusions, the Court of Criminal Appeals did not identify which of Judge Baird's fact findings it adopted and which it rejected. Given the well-established rules governing habeas petitions and the need for federal courts to defer to state court findings, it is frustrating that the appellate court was not more specific in stating *which* of Judge Baird's findings it was adopting and which it was rejecting. Its failure to do so makes this Court's job much more difficult. *See, e.g.*, *Murphy v. Davis*, ___F.3d ___, 2018 WL 4042362 (5th Cir. Aug. 24, 2018) (addressing when a Texas state habeas trial court's findings remain viable following a decision by the Court of Criminal Appeals that did not result in a clear adoption or rejection of the findings).

*Cockrell*, 537 U.S. at 346-47. As discussed herein, several of the Court of Criminal Appeals' findings related to Jimenez's *Strickland* claim based on Mr. Martinez's failure to preserve her *Ake* claim, were plainly unreasonable in light of the record before the state court.

The prosecution's theory of Jimenez's guilt was straightforward: (1) it was physically impossible for a child B.G.'s age to place five paper towels into their own mouth and swallow them; (2) therefore, the only way the paper towels could have been lodged in B.G.'s throat was by being forcibly put there by an adult; (3) the only adult who was with B.G. at the time of his choking was Jimenez; and thus (4) Jimenez must have stuffed the paper towels down B.G.'s throat. Accordingly, if in fact it was possible for a 21-month-old child to place five paper towels in their mouth and accidentally choke on them, the State's theory was unfounded. The State presented no direct evidence that Jimenez purposefully caused B.G.'s death—there were no eyewitnesses, no prior acts of abuse or expressions of anger, no signs of a substantial injury to the child's face or Jimenez's hands, and no confession. Jimenez's DNA was not found on the paper towels extracted from B.G.'s throat. All of the other evidence the prosecution pointed to—the slightly disputed time line of the events, Jimenez's allegedly inculpatory statement to Detective De Los Santos, and the minor discrepancies in Jimenez's statements of exactly how she discovered B.G. was choking—was not even close to enough evidence to allow a jury to find Jimenez guilty. If the "impossibility" of this being an accident equaled guilt, then conversely, proof of the "possibility" that it was in fact an accident created reasonable doubt.

The decisive question of fact at trial, therefore, was whether it was physically possible for a 21-month-old child to swallow and choke on the object removed from B.G.'s mouth. Mr. Martinez's own statements indicate he understood this would be the central issue at trial. In one of

his motions seeking funds to hire an expert, Mr. Martinez stated that "[c]ounsel needs assistance to prepare for the State's medical experts who will testify that the child could not have choked accidentally under the circumstances of this particular case." (ECF No. 24-1 at 251).

As noted, the Court of Criminal Appeals rejected this ineffective assistance of counsel claim because it concluded the result of the trial would likely have been the same even if the experts presented at the state habeas hearing had testified at the trial. This conclusion was based on a number of determinations of fact that are plainly unreasonable when viewed in light of the record before the state court. Perhaps the most obvious example of this is the appellate court's determination that:

> [t]he additional experts that applicant has now produced are perhaps even more qualified than Dr. Kanfer, but she has not shown how their testimony would be significantly different or more persuasive than was Dr. Kanfer's. They reached *exactly the same ultimate opinion* as Dr. Kanfer *and for almost precisely the same reasons*.

*Ex parte Jimenez*, 364 S.W.3d at 888 (emphasis added). This conclusion is clearly and convincingly rebutted by the record.

First and foremost, although the habeas experts reached the same "ultimate" conclusion—that B.G.'s choking was an accident—that alone does not create an equivalence of reasoning or persuasiveness. By definition, expert testimony requires "expertise." An unqualified expert testifying to a fact is not the same as having a thoroughly competent expert testify to the same fact. The expert's training, experience, and education matter greatly. To conclude that, because Dr. Kanfer opined that the choking was an accident, the jury would not have reached a different conclusion had it heard Drs. McCloskey, Zur, Ophoven, and Dunham opine that the choking was an accident, is wholly unreasonable in light of the record. Indeed, as the prosecution so effectively demonstrated at trial, it was questionable whether Dr. Kanfer was even qualified to address this dispositive issue.

Dr. Kanfer himself admitted at trial that he was not specifically qualified to testify as to pediatric choking incidents or child abuse,[16] and he admitted his research into the subject matter was largely reviewing articles on the Internet, (ECF No. 24-7 at 129), and watching a TV show that discussed anecdotes of children swallowing strange objects. (ECF No. 24-7 at 110).[17]

In contrast, the experts presented to the state habeas court had the very qualifications needed to offer persuasive testimony on this issue. Dr. Zur was a pediatric critical care and airways specialist (ECF No. 25-3 at 75-76), and Dr. McCloskey was a pediatric critical care physician, who had "seen first-hand instances of accidental ingestion of foreign bodies in the airway and where an airway was obstructed as a result of confirmed child abuse."(ECF No. 25-3 at 83-84). Dr. Dunham was a pediatric otolaryngologist with experience in treating "children with foreign bodies in their aerodigestive tracts, " including an incident of a child choking on a piece of bread that "may have been wider than this wad of paper towel." (ECF No. 25-5 at 91-93). Dr. Ophoven was a pediatric forensic pathologist with thirty years of training and experience in evaluating pediatric injuries and death. (ECF No. 25-3 at 90).

---

[16] Dr. Kanfer had never attended a professional conference on child abuse. (ECF No. 24-7 at 119). He had never published on the subject or been invited to speak on the subject. Somewhat incredulously, Dr. Kanfer testified that he had examined "dozens and dozens" of live children as a forensic pathologist, and that the police brought him photos of children believed to have been abused, and that "sometimes they actually bring in the live people." (ECF No. 24-7 at 124-25).

[17] Mr. Martinez identified Dr. Kanfer's primary qualification to be the fact that he "was the expert in the 'Boston Nanny' case that made national news," (ECF No. 25-2 at 60), and because he "worked with Dr. Henry Lee, the famous Henry Lee of the O.J. Simpson trial." (ECF No. 25-2 at 11). As it turns out, Dr. Kanfer did not participate in the "Boston Nanny" case (a case in which the defendant was convicted—*see Commonwealth v. Woodward*, 694 N.E.2d 1277 (Mass. 1998)). (ECF No. 35 at 19 n.39). The record is silent regarding why Mr. Martinez believed that Dr. Kanfer had been an expert in the "Boston Nanny" case, but Mr. Martinez was clearly impressed by that, and by his association with Dr. Lee. The Court of Criminal Appeals repeated the "Boston Nanny" case claim twice, including as support for the conclusion that Dr. Kanfer "had some pediatric experience." *Ex Parte Jimenez*, 364 S.W.3d at 879, 884.

The Court of Criminal Appeals' statement that these four experts would have testified to the same opinion as Dr. Kanfer "for almost precisely the same reason" is completely unreasonable in light of the record, as are its findings that the habeas experts' opinions were not "new" or "materially different" than those of Dr. Kanfer. *Ex Parte Jimenez*, 364 S.W.3d at 875, 888. These findings wholly disregard key aspects of the record. All of the defense's state habeas experts' opinions were both substantively "new" and materially different, because the habeas experts based their testimony on their clinical experience, rather than conducting an "experiment" with a toilet paper tube. (ECF No. 24-7 at 52-53).[18] The habeas experts' "reasons" for their opinions included their many years of treating airway obstructions in children. Dr. Kanfer did not treat pediatric choking victims; he was a forensic pathologist. In contrast, Dr. Zur, Dr. McCloskey, and Dr. Dunham all had extensive experience with cases of pediatric choking. And the Court of Criminal Appeals never mentions Dr. Dunham's statements at all, completely overlooking the fact that he had personal experience with a child who had accidentally choked on a piece of bread possibly wider than the wad of paper towels found in B.G.'s airway. (ECF No. 25-5 at 93).

Not only were the habeas experts' opinions based on their superior experience and qualifications, but they were also based on their full review of the record evidence and their consultations with other specialists, whereas Dr. Kanfer had no training or experience with regard to pediatric choking, he did not review all of the evidence,[19] and his statement that he consulted with

---

[18]When taken on voir dire by the prosecutor prior to testifying, Dr. Kanfer admitted he had never heard of a case involving a child swallowing a wad of paper such as was involved in this case. (ECF No. 24-7 at 15).

[19] When asked about "the materials" he reviewed in reaching his opinion, Dr. Kanfer replied: "The summaries of the police reports. . . .a tape from the crime-scene lab where they opened up the wad of towel paper. I also have the ABC tape, children swallowing items. And that's about it." (ECF No. 24-7 at 110).

"colleagues" is not supported by the record. Additionally, Dr. Zur's and Dr. McCloskey's rendition of their opinions at the state habeas hearing was eminently more professional and credible than Dr. Kanfer's testimony before the jury. (ECF No. 25-7 at 18-165 (Dr. Zur); 293-425 (Dr. McCloskey)). The habeas experts were not motivated to give their opinions by financial considerations, (*see, e.g.*, ECF No. 25-7 at 420), and their presentation was infinitely less profane, rambling, and defensive than that of Dr. Kanfer. Indeed, the Court of Criminal Appeals admits that the habeas experts' opinions were based on "scientific methodology" and "were supported by scientific data," *Ex parte Jimenez*, 364 S.W. 3d at 874, yet it makes no similar conclusion regarding Dr. Kanfer's testimony. Nor could it, as his conclusions were supported by his own impromptu experiment saturating and wadding-up paper towels and stuffing them through a toilet paper tube, (ECF No. 24-7 at 52-53), and he had no relevant clinical experience whatsoever.

The material differences between Dr. Kanfer's testimony and the testimony of the habeas experts are too many to list. Dr. McCloskey compared this case to other patients he had treated where he knew (from a confession or other evidence) that someone had intentionally shoved a large object into a child's mouth. (ECF No. 25-7 at 306-07, 383, 392, 415-16, 421). He noted that the victims in those cases exhibited injuries to the child that were not found on B.G. (ECF No. 25-7 at 306-07, 314-16, 383, 416-17, 421, 425). Dr. McCloskey was board-certified in pediatrics and pediatric critical care, and had "first-hand experience in treating both accidental choking cases and similar instances of child abuse," which gave "him a unique perspective on the evidence that lends additional credibility to his opinions regarding this injury." (ECF No. 25-6 at 57). Dr. McCloskey clearly stated that he did not believe that the choking could have been intentional because of the lack of any

significant injury to B.G. or Jimenez. (ECF No. 25-7 at 415-17, 421).[20] Dr. Zur reached the same conclusion regarding the lack of any significant injury indicating the choking was not intentional. (ECF No. 25-3 at 75, 82). Judge Baird found Dr. Zur's and Dr. McCloskey's "objectivity and superior qualifications were clearly demonstrated at the hearing." (ECF No. 25-6 at 58).

The Court of Criminal Appeals concluded the defense "cogently, coherently, and completely" presented, through "medical evidence," the "defensive theory" that B.G.'s demise was the result of a "self-inflicted accidental death." *Ex parte Jimenez*, 364 S.W.3d at 874, 888. This factual finding simply ignores the trial record. The prosecution's medical evidence supporting the "impossibility" of an accident was presented by three physicians, two forensic pathologists, and an expert on child abuse. In contrast, the only contrary evidence presented by the defense was from Dr. Kanfer, a forensic pathologist, and the trial transcript clearly reveals his presentation was neither cogent, coherent, nor complete. Judge Baird noted that, in his "30 years as a licensed attorney, [and] 20 years in the judiciary, this Court has never seen such unprofessional and biased conduct from any witness, much less from a purported expert." (ECF No. 25-6 at 66-67). Dr. Kanfer's testimony was

---

[20] Dr. McCloskey testified:

I've seen a lot of nonaccidental trauma, and it can be very difficult at times to prove. But I know nonaccidental trauma when I see it, and, again, what sticks out at me mostly about this case, I will agree it would be unusual to have that amount of paper in a child's mouth. No question about it. I will agree with that. However, if this was nonaccidental or if this was inflicted or trauma, there would be other injuries, and I have seen that almost invariably at every other child that I've taken care of. *And so that's what really sticks in me, the greatest impression that I get from this. There is other points that I make in terms of resuscitation and the description of how long this child was down, but the absence of external marks or other internal injuries, especially in the mouth, leaves me to think that this is a nonaccidental – or this is an accident that happened. This is an accident. I can't refute that.*

(ECF No. 25-7 at 421) (emphasis added).

colloquial, disjointed, rambling, profane, and argumentative. He admitted his lack of credentials and lack of preparation. Finally, the Court of Criminal Appeals fails to account for the fact that Dr. Kanfer approached the prosecutors during a recess and told them they "could go fuck themselves," something the jury heard repeated *four* times. Ignoring the impact this statement had on the weight the jury placed on Dr. Kanfer's opinions when it was analyzing whether the result would not have been different if the jury had heard the testimony of the habeas experts rather than Dr. Kanfer was a completely unreasonable determination and is not fairly supported by the record.[21]

Thus, the Court of Criminal Appeals' determination that Jimenez was not prejudiced by Mr. Martinez's failure to preserve error on her *Ake* claim was a wholly unreasonable factual determination in light of the evidence before it and an unreasonable application of the prejudice prong of the *Strickland* analysis. It is simply not plausible to conclude that a jury who heard the testimony of the experts presented at the habeas proceeding would have returned the same verdict as a jury who only heard Dr. Kanfer. The best evidence of this conclusion comes from the trial judge. Judge Wisser noted that, based solely on the trial testimony, "there [wa]s a substantial likelihood that the defendant was not guilty of this offense." (ECF No. 25-9 at 333). When he added the habeas experts' affidavits to the analysis, his concern "that the death of the child was an accident and not a homicide" was "increased," and the experts' opinions "undermined [his] confidence in the verdict that was rendered at Ms. Jimenez's trial." (ECF No. 25-9 at 334).

---

[21] The Supreme Court has explained that both prongs of the *Strickland* analysis involve mixed questions of law and fact. *Strickland*, 466 U.S. at 698. Thus, when a federal court is reviewing *Strickland* findings, the AEDPA's "'unreasonable application of' clause takes on meaning. While the determination of 'prejudice' in the legal sense may be a question of law, the subsidiary inquiries are heavily factbound." *Williams v. Taylor*, 529 U.S. 362, 419 (2000) (Rehnquist, J., concurring in part and dissenting in part). *See also Draughon v. Dretke*, 427 F.3d 286, 296-97 (5th Cir. 2005).

Because the Court of Criminal Appeals' factual findings were an unreasonable determination of the facts in light of the record and an unreasonable application of *Strickland*'s prejudice test, this Court is not bound to defer to these findings. *See Kimmelman*, 477 U.S. at 390 (1986); *Draughon v. Dretke*, 427 F.3d 286, 296-97 (5th Cir. 2005). Disregarding those findings, the Court must decide, based on the facts in the record before it, whether Jimenez is entitled to relief on her claim that Mr. Martinez was ineffective by failing to properly seeking funding for an expert witness and failing to preserve for appeal the denial of additional funds for a more qualified expert.

### 2.     Counsel's Ineffective Assistance in Documenting Requests for Experts

There is no question that Mr. Martinez's performance was below prevailing professional norms with regard to his handling of the motions seeking approval for the retention of experts and his failure to make a record of the trial court's rulings on these motions. The Court of Criminal Appeals implicitly (and perhaps explicitly) reached this conclusion when it concluded Jimenez's *Ake* claim was procedurally defaulted. The appellate court stated :

> But a trial judge does not err in denying an informal, off-the-record request for additional funding for experts when he is not presented with a written motion that contains affidavits or other evidence that would support the defendant's request. If Judge Wisser had denied an informal, off-the-record request for additional funding for experts, applicant could have preserved that constitutional issue by filing a formal motion ex parte with the appropriate affidavits or information supporting the request before trial. Then she could have raised that claim in her motion for a new trial or on direct appeal. . . . In this case, applicant forfeited consideration of her *Ake* claim on habeas review because she failed to preserve her constitutional claim in the trial court by filing a proper written *Ake* motion and ensuring that the trial judge formally ruled on it.

*Ex parte Jimenez*, 364 S.W.3d at 882.

Even if the Court of Criminal Appeals had not made these findings, the record demonstrates that counsel was deficient in failing to file proper *Ake* motions and document the trial court's ruling

on those motions. The failure to follow the designated procedure to obtain funds for an expert witness, or to preserve the rejection of such a request for appellate review, is *per se* deficient performance. *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (lack of awareness of the state requirements for funding expert witnesses when counsel himself "deemed" his expert "inadequate" was a "quintessential example of unreasonable performance under *Strickland*."); *Canales v. Stephens*, 765 F.3d 551 (5th Cir. 2014). If counsel's failure to raise a non-meritorious claim is per se not deficient performance or prejudicial, *Turner v. Quarterman*, 481 F.3d 292, 298 (5th Cir. 2007); *Parr v. Quarterman*, 472 F.3d 245, 256 (5th Cir. 2006), then the failure to raise a meritorious claim is deficient performance and prejudicial.

Mr. Martinez avers that when he knew he needed additional expert assistance he approached Judge Wisser and made an informal ex parte request for this assistance, and Judge Wisser denied this request. (ECF No. 25-3 at 110). Mr. Martinez's "informal" procedure for obtaining funds for the retention of expert witnesses did not comply with the requirements of Texas law. At the time of trial, the settled Texas law was that *Ake* required that expert funding be provided to indigent defendants. *Rey v. State*, 897 S.W.2d 333, 337-38 (Tex. Crim. App.1995). *Rey* and subsequent cases also explained what Texas law required of counsel to properly seek that funding:

> [I]n cases holding that a sufficient showing was not made under *Ake*, the defendant typically has failed to support his motion with affidavits or other evidence in support of his defensive theory, an explanation as to what his defensive theory was and why expert assistance would be helpful in establishing that theory, or a showing that there was a reason to question the State's expert and proof.

*Id.* at 341 (citing cases). None of the motions seeking expert assistance filed by Mr. Martinez followed these guidelines. Mr. Martinez filed motions to retain a forensic medical expert, an expert on child behavior, an expert in child abuse and family violence, and a criminalist or forensic

scientist. (ECF No. 24-1 at 215-16, 243-44, 251-52). The motions only identify the broad category of expertise sought and do not reveal the expert's name, what the expert will do, or explain why the proposed expert's testimony is critical to the defense. None had affidavits attached. Furthermore, only the motion seeking an expert on child behavior cited *Ake v. Oklahoma*. (ECF No. 24-1 at 215). Mr. Martinez even retained one expert—the psychologist Dr. Parker—without any motion seeking, or order approving, funding for this expert. An attorney's lack of awareness of a state's requirements for funding expert witnesses is a "quintessential example of unreasonable performance under *Strickland*." *Hinton*, 571 U.S. at 274 ("The only inadequate assistance of counsel here was the inexcusable mistake of law—the unreasonable failure to understand the resources that state law made available to him—that caused counsel to employ an expert that he himself deemed inadequate.").[22]

Mr. Martinez did not utilize the proper procedure for requesting funding for expert witnesses nor did he preserve the denial of such funding for review, and this failure constitutes deficient performance. *Hinton*, 571 U.S. at 274; *Kimmelman*, 477 U.S. at 385 (finding deficient performance where counsel failed to conduct pretrial discovery and that failure "was not based on 'strategy,' but on counsel's mistaken belie[f] that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense"); *Canales v. Stephens*, 765 F.3d 551, 569 (5th Cir. 2014)

---

[22] The Court of Criminal Appeals stated: "[t]here is nothing in the trial record that shows that the trial judge denied any *Ake* motions or other requests for monetary assistance to retain experts." *Ex parte Jimenez*, 364 S.W.3d at 879. This is factually incorrect. Jimenez's trial counsel filed five motions seeking the appointment of defense experts. (ECF No. 24-1 at 215-16 (motion to retain child behavior witness, citing *Ake*); ECF No. 24-1 at 243-44 (motion to retain an expert on child abuse and family violence); ECF No. 24-1 at 247-48 (the first motion to retain a "simulation re-enactment expert"); ECF No. 24-1 at 251-52 (an expert in forensic medicine); ECF No. 24-1 at 239-40 (motion to retain a criminalist or forensic scientist)). The only one of these motions that was explicitly granted was that requesting funding to retain an expert in forensic medicine—the order that led to the hiring of Dr. Kanfer. (ECF No. 24-1 at 254). There are no orders in the record either granting or denying any of the other motions. Without an order granting a motion, the most generous assumption a reviewing court can make is that the motion was *not* granted, which in the case of a request for funding to hire an expert, is tantamount to a denial.

(finding deficient performance where the defense attorney opted to not conduct a mitigation investigation because he believed he could not get sufficient funds).

The State argues, relying on Mr. Martinez's two affidavits in the state habeas action—which it concedes are "confusing"—that the failure to preserve the *Ake* claim could have been the result of a strategic decision. (ECF No. 32 at 34-35, 42, 55-56). But the affidavits do not support this argument. Regardless of how one reads the affidavits, nowhere does Mr. Martinez state that he chose not to preserve this error for any strategic purpose. The most direct statement on this point is in his second affidavit, where he declared he told the trial judge he "did not think that [his] current team [of experts] was adequate to counter the State's case," but that Judge Wisser told him "[the court] would not pay for any more expert assistance" and, accordingly, counsel "was forced to work within the constraints imposed by the Court." (ECF No. 25-3 at 110). Nowhere does Mr. Martinez say that he made a strategic decision not to make a record of this decision.

Nor could a "strategy" to waive reversible error ever be deemed reasonable. *See, e.g., Hinton*, 571 U.S. at 273; *Williams*, 529 U.S. at 395-96. Most relevant to this analysis is the fact that the defense had nothing to gain by not insisting that Judge Wisser's rulings on expert funding motions be reflected in written orders, and the record is devoid of any claim by Mr. Martinez that he made a considered decision to not preserve the trial court's decision to deny additional funding. Although Mr. Martinez claims he intentionally failed to object to many other things during the proceedings, he has never claimed that his waiver of the *Ake* claim was a strategic decision.[23] It is stating the

---

[23] There is a good deal of discussion in the briefing, both here and in the state court proceedings, concerning the number of things Mr. Martinez did not object to during trial. In his first affidavit, Mr. Martinez offered this explanation for these decisions:

[Co-counsel] did not completely agree with me and during the trial had told me to object to

34

obvious to say that waiving error on a meritorious *Ake* claim is not a "reasonable" trial strategy. It brings to mind the Fifth Circuit's recent statement in a habeas case: "Even with the two-tiers of deference that *Strickland* and AEDPA combine to afford counsel's performance, at some point trial strategy becomes trial stupidity." *Sanchez v. Davis*, 888 F.3d 746, 751 (5th Cir. 2018). The failure to preserve the *Ake* claim was plainly deficient.

Furthermore, this deficient performance prejudiced Jimenez because her *Ake* claim was meritorious. In *McWilliams v. Dunn*, the Supreme Court held that the right to an independent defense expert required the expert be able to help the defense evaluate the opposing experts' opinions and translate the data into a sound and convincing legal strategy, and help the defense prepare to effectively cross-examine the prosecution's witnesses. 137 S. Ct. at 1800-01. When the state does not provide such an expert to the defense, a state court's denial of an *Ake* claim is contrary to or involves an unreasonable application of federal law. *Id.* at 1801 ("Since Alabama's provision of

---

certain actions by opposing counsel and I decided not to. She was of course right in wanting to preserve the record. I knew the Judge would allow the actions and *my belief was that if we do not prevail at trial our chance on appeal was going to be nil anyway. My belief was reasonable in light of the decisions of our appellate courts even where error was shown and preserved by proper objection.*

(ECF No. 25-2 at 9-10). To put this bluntly, Mr. Martinez claims that because he believed Jimenez's only chance to prevail was at the jury trial rather than on appeal, there was no reason to preserve error, so he did not do so. (ECF No. 25-2 at 10). Mr. Martinez later conceded that at least some of the decisions not to object were the result of "shell shock and fatigue." (ECF No. 25-1 at 61). Another possible cause for the choice not to object to actual error may have been an unreasonable overconfidence regarding the strength of his defense. Mr. Martinez repeatedly stated that he simply could not comprehend how a jury would find the prosecution's theory of the case believable:

- "We thought the State's theory was incredible."
- "I thought [the State's theory of events] was an outlandish theory."
- "[I]t appeared obvious they did not know and were speculating."
- "We believe that some of the State's witnesses testimony verged on perjury if not just outrageous."

(ECF No. 25-2 at 8-9, 17).

mental health assistance fell so dramatically short of what *Ake* requires, we must conclude that the Alabama court decision affirming McWilliams's conviction and sentence was "contrary to, or involved an unreasonable application of, clearly established Federal law."). The Court of Criminal Appeals rejected Jimenez's *Ake*-based ineffective assistance of counsel claim because it found that the absence of testimony from experts such as Drs. Zur, McCloskey, and Ophoven, did not create a "high risk of an inaccurate verdict." *Ex parte Jimenez*, 364 S.W.3d at 888. This was an unreasonable application of the law to the facts in this case, and an unreasonable determination of the facts in light of the record before the Court of Criminal Appeals.

Additionally, when it decided Jimenez was not prejudiced by counsel's deficient performance the Court of Criminal Appeals incorrectly framed the issue as "whether the constitution requires that an indigent defendant be provided with an absolute (or even rough) equivalency of experts." *Id.* at 887. This is not what *Ake* holds. The correct analysis is whether Jimenez's counsel's error denied her an expert adequate to build "an *effective* defense . . . fundamental fairness entitles indigent defendants to an adequate opportunity to present their claims fairly within the adversary system." *Ake*, 470 U.S. at 77 (emphasis added and internal quotations omitted). As the undersigned has already discussed at length, the lack of at least one appropriately qualified expert unquestionably denied Jimenez an effective defense. The lack of at least one sufficiently qualified expert deprived Jimenez of a fair adversarial process because it allowed the testimony of the state's expert witnesses on the crucial issue at trial—whether it was "impossible" for B.G. to have accidentally swallowed the paper towels—to go essentially unchallenged. For the reasons already set out at length, it is reasonably probable that, had the jury heard the opinions of Dr. Zur, Dr. McCloskey, Dr. Dunham,

Dr. Ophoven, or some combination of them, the outcome of Jimenez's trial would have been different.

The expert deficiencies were not limited to forensics. There was no defense expert with the experience or training to respond to Dr. Alexander's theory that inconsistencies in Jimenez's description of the choking incident was evidence of child abuse. Had Jimenez been afforded experts with clinical pediatric experience like Dr. Zur, Dr. Durham, or Dr. McCloskey, they could have explained to the jury that it is common for there to be inconsistencies in medical histories provided by lay persons (even those given in far less stressful circumstances), and such inconsistencies are not indications of abuse. (ECF No. 25-7 at 163-64, 353). Additionally, a child abuse expert such as Dr. McCloskey could have explained that the inconsistency identified by the State—whether B.G. was standing or on the ground when Jimenez discovered him choking—was not the sort of inconsistency that specialists would find relevant to a child abuse determination. (ECF No. 25-7 at 353-54, 358-59). Instead, the child abuse testimony went completely unchallenged by the defense.

Dr. Kanfer also admitted that he was not an expert on child development; this deficiency meant that Dr. Kanfer was unable to respond to the State's pediatric medical experts who told the jury that children B.G.'s age do not willingly place paper towels in their mouth and that B.G. was not developmentally capable of placing the wad of paper towel in his mouth. Because Dr. Kanfer had no clinical pediatric experience and did not regularly encounter cases of non-fatal pediatric choking, he could not tell the jury of his own experience in removing large objects from the airways of children, as could Dr. Zur, Dr. Dunham, and Dr. McCloskey. Because the State's case was based on the premise that it was "impossible" for B.G. to have choked on an object as large as the one

removed from his airway, testimony from specialists such as Dr. Zur, Dr. Dunham, Dr. McCloskey, and Dr. Ophoven was crucial to the defense.

Accordingly, the Court of Criminal Appeals' conclusion that Jimenez was not prejudiced by the failure to preserve her *Ake* claim was an unreasonable determination of the facts in light of the record and an unreasonable application of *Strickland*.

### 3. *Hinton v. Alabama* **supports granting the writ**

The Supreme Court's 2014 decision in *Hinton v. Alabama* provides additional support for the conclusion that Jimenez was prejudiced by her counsel's failure to preserve the *Ake* claim. In *Hinton* the defendant's counsel wrongly believed that he was limited to receiving $1,000 to retain expert witnesses. The case against his client rested entirely on whether six bullets found at the crime scenes could be tied to the defendant's gun.

> Operating under the mistaken belief that he could pay no more than $1,000, Hinton's attorney went looking for an expert witness. According to his postconviction testimony, he made an extensive search for a well-regarded expert, but found only one person who was willing to take the case for the pay he could offer: Andrew Payne.

571 U.S. at 268. And, just as Dr. Kanfer testified in this case that it was possible, if not likely, that B.G.'s choking was accidental, in the *Hinton* case the retained expert fully supported the defendant's theory:

> Payne testified that the toolmarks in the barrel of the Hinton revolver had been corroded away so that it would be impossible to say with certainty whether a particular bullet had been fired from that gun. He also testified that the bullets from the three crime scenes did not match one another. The State's two experts, by contrast, maintained that all six bullets had indeed been fired from the Hinton revolver.

*Id.*

Additionally, as in Jimenez's case, Hinton's expert was "badly discredited" on cross-examination, *id.* at 269, and Hinton was convicted. Similar to what Jimenez did in her state habeas action, in his state habeas action Hinton "produced three new experts on toolmark evidence," all of whom were eminently qualified:

> One of the three, a forensic consultant named John Dillon, had worked on toolmark identification at the Federal Bureau of Investigation's forensics laboratory and, from 1988 until he retired in 1994, had served as chief of the firearms and toolmark unit at the FBI's headquarters. The other two postconviction experts had worked for many years as firearms and toolmark examiners at the Dallas County Crime Laboratory and had each testified as toolmark experts in several hundred cases.

*Id.* at 270. And, just as is the case here, all three of Hinton's experts testified consistently with the one, less-qualified expert who testified at trial, that is, "they could not conclude that any of the six bullets had been fired from the Hinton revolver." *Id.* Finally, just as the Texas Court of Criminal Appeals rejected Jimenez's petition because the habeas experts' testimony was no different from that presented at trial, in *Hinton* the state court also denied relief, finding that "Hinton had not been prejudiced by [the expert's] allegedly poor performance because [the expert's] testimony did not depart from what Hinton's postconviction experts had said." *Id.* at 270-71.

After finding the attorney deficient for misunderstanding the resources he had available to hire experts, the Supreme Court turned to the question of whether his mistake prejudiced Hinton. Its discussion of that issue is remarkably brief, and directly on point with this case. After restating the relevant law, the Court considered the state's contention that there was no prejudice because the defense's trial expert "said all that Hinton could have hoped for from a toolmark expert: that the bullets used in the crimes could not have been fired from the Hinton revolver." *Id.* at 275. The Supreme Court was not persuaded:

It is true that Payne's testimony would have done Hinton a lot of good *if the jury had believed it.* But the jury did not believe Payne. And if there is a reasonable probability that Hinton's attorney would have hired an expert who would have instilled in the jury a reasonable doubt as to Hinton's guilt had the attorney known that the statutory funding limit had been lifted, then Hinton was prejudiced by his lawyer's deficient performance and is entitled to a new trial.

*Id.* at 275-76 (emphasis original). The Supreme Court also mentioned that in prior cases it had

noted [s]erious deficiencies have been found in the forensic evidence used in criminal trials. . . . One study of cases in which exonerating evidence resulted in the overturning of criminal convictions concluded that invalid forensic testimony contributed to the convictions in 60% of the cases.

*Id.* at 276 (citations omitted). Finding that the lower courts had never made the proper prejudice analysis, the Supreme Court remanded the case "for reconsideration of whether Hinton's attorney's deficient performance was prejudicial under *Strickland*." *Id.*

This case is on all fours with *Hinton*. Mr. Martinez has said that the experts' testimony at the habeas hearing was "exactly the sort of testimony that I needed during the trial," but he did not have the resources to obtain these experts. (ECF No. 25-3 at 110). And although Dr. Kanfer testified consistently with the defense theory, on cross examination he was "badly discredited," and not only because of his unprofessional actions, but also because of his lax preparation and his lack of relevant clinical experience or pediatric airway training. Most critically, the *Hinton* Court directly rejects the very analysis the Court of Criminal Appeals employed to conclude that Jimenez was not prejudiced by her counsel's failure to preserve error on the expert funding issue. Simply determining that the trial expert testified to the same opinions as the more qualified habeas experts is not enough to determine if there has been prejudice. Instead, the correct rule is "if there is a reasonable probability that [the defendant's] attorney would have hired an expert who would have instilled in the jury a

reasonable doubt as to [the defendant's] guilt had the attorney [not been deficient], then [the defendant] was prejudiced by his lawyer's deficient performance . . ." *Hinton*, 571 U.S. at 276.

Applying that rule here, there is little question that if Mr. Martinez had taken the correct procedural steps to obtain funding, or had preserved the error for reversal and remand, he would have been able to retain a "better expert," i.e., any of the physicians who testified at the habeas hearing, each of whom would have made a far more compelling case for Jimenez than Dr. Kanfer. One of the best indications of this is the conclusion reached by the only jurist who heard the live trial testimony and also reviewed all of the habeas experts' opinions—Judge Wisser. He says that "[t]he experts that the defense produced at the writ hearing have increased my concerns that the death of the child was an accident and not a homicide. *This new evidence undermines my confidence in the verdict that was rendered at Ms. Jimenez's trial.*" (ECF No. 25-9 at 333) (emphasis added). As has already been presented at length, there is little doubt that, had the experts presented at the habeas hearing testified at the trial, there is a reasonably probability that they would have instilled in the jury a reasonable doubt as to the cause of B.G.'s choking, and thus as to Jimenez's guilt. In short, the failure to preserve the *Ake* issue for appeal prejudiced Jimenez.

Because Jimenez has established that her counsel's performance was deficient and that the deficient performance prejudiced her, the state court's denial of relief on this claim was not a reasonable application of *Strickland* and she is entitled to relief on this claim.

**B.    *Ake v. Oklahoma***

Jimenez also asserts a "freestanding" *Ake* claim in her federal habeas petition. While this claim overlaps her meritorious *Strickland* claim in many respects, there is an important difference. The ineffective assistance claim is based on Mr. Martinez's failure to properly request experts and

41

properly document the trial court's rulings on these requests, while the freestanding *Ake* claim is predicated on the claim that the trial court denied expert funding Mr. Martinez requested. Judge Baird recommended the Court of Criminal Appeals grant relief on Jimenez's *Ake* claim, as he concluded the trial court failed to provide Jimenez adequate funding for experts. (ECF No. 25-6 at 65-66). He based this conclusion on several factual findings, including facts contained in Mr. Martinez's uncontroverted affidavits. (*Id.* at 61 ¶ 56). Judge Baird concluded that counsel "sought funding for experts through informal ex parte meetings with Judge Wisser," but his "informal *ex parte* requests for additional experts were denied by Judge Wisser." (*Id.* at ¶ 57). He further noted that Mr. Martinez "did not file written motions to document his requests for additional funding for experts in choking and did not document his explanation to the Court for why he needed additional funds for these experts. Instead, Mr. Martinez worked within the budgetary constraints imposed by Judge Wisser." (*Id.* at 62 ¶ 58).

Unlike Judge Baird, the Texas Court of Criminal Appeals did not grant relief on the *Ake* claim. It did so not because it disagreed with his factual findings but because it found the *Ake* claim procedurally defaulted. *Ex parte Jimenez*, 364 S.W.3d at 880-82. When a state court expressly bases its dismissal of a prisoner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for dismissal, that claim has been procedurally defaulted. *Walker v. Martin*, 562 U.S. 307, 315 (2011). It is well-settled that the Texas contemporaneous objection rule constitutes an adequate and independent state ground for dismissal of a claim, *Cardenas v. Dretke*, 405 F.3d 244, 249 (5th Cir. 2005), and Jimenez's *Ake* claim was thus procedurally defaulted in the state courts because it was not properly preserved by Mr. Martinez.

A federal habeas petitioner is not entitled to relief on a procedurally defaulted claim unless she can show cause and prejudice for her default of the claim, or show that a fundamental miscarriage of justice will occur if the claim is not considered. *Martinez v. Ryan*, 566 U.S. 1, 10 (2012); *Canales*, 765 F.3d at 562. Ineffective assistance of counsel constitutes cause for a procedural default if that ineffective assistance claim was presented to the state courts as an independent claim. *Murray*, 477 U.S. at 488-89. Jimenez properly exhausted an ineffective assistance of counsel claim based on the failure to preserve her *Ake* claim in her state habeas proceeding. In the prior section, the undersigned has concluded that this ineffective assistance claim has merit. As a result, Jimenez has overcome her procedural default of the claim and the Court may reach its merits. Because the Court of Criminal Appeals did not address the merits of the *Ake* claim, the Court considers the legal merits of the claim *de novo*. *Brumfield*, 135 S. Ct. at 2282; *Wiggins*, 539 U.S. at 534.

In *Ake v. Oklahoma*, the Supreme Court held that a state criminal defendant's right to due process of law encompasses the appointment of an expert witness at the state's expense.

> Meaningful access to justice has been the consistent theme of [our prior] cases. We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, *see Ross v. Moffitt*, 417 U.S. 600 . . . (1974), it has often reaffirmed that fundamental fairness entitles indigent defendants to "an adequate opportunity to present their claims fairly within the adversary system," *id.*, at 612 . . . . To implement this principle, we have focused on identifying the "basic tools of an adequate defense or appeal," *Britt v. North Carolina*, 404 U.S. 226, 227. . . (1971), and we have required that such tools be provided to those defendants who cannot afford to pay for them.

470 U.S. 68, 77 (1985). The Supreme Court has not explicitly extended this holding beyond the provision of a psychiatric expert witnesses to a defendant. *See Briseno v. Cockrell*, 274 F.3d 204,

208-09 (5th Cir. 2001); *Gary v. Hall*, 558 F.3d 1229, 1254 (11th Cir. 2009); *Hawkins v. Mullin*, 291 F.3d 658, 671 n.6 (10th Cir. 2002).

However, Texas courts and the Fifth Circuit have extended *Ake* beyond psychiatric experts, and have required the appointment of non-psychiatric experts to indigent criminal defendants when warranted. *E.g., Moore v. Johnson*, 225 F.3d 495, 502 (5th Cir. 2000);[24] *Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir. 1993); *Griffith v. State*, 983 S.W.2d 282, 286 (Tex. Crim. App. 1998) ("While the *Ake* case dealt with the appointment of a psychiatrist, it is now without question that *Ake* requires the appointment of an expert regardless of his field of expertise."); *Rey*, 897 S.W.2d at 337-38 ("There is no principled way to distinguish between psychiatric and nonpsychiatric experts. The question in each case must be not what field of expert knowledge is involved, but rather how important the scientific issue is in the case, and how much help a defense expert could have given."). The Fifth Circuit has held that *Ake* requires non-psychiatric experts be provided if the subject evidence is both critical to conviction and subject to varying expert opinion. *See Aguilar v. Dretke*, 428 F.3d 526, 534 (5th Cir. 2005) (denying relief because the defendant failed to make this showing); *Briseno*, 274 F.3d at 208-09; *Moore*, 225 F.3d at 502; *Yohey*, 985 F.2d at 227.[25]

---

[24] The Fifth Circuit's holding in *Moore* is predicated on the decision in *Yohey*, which in turns cites *Scott v. State of Louisiana*, 934 F.2d 631, 633 (5th Cir. 1991) (wherein the defendant sought a ballistics expert, citing *Barnard v. Henderson*, 514 F.2d 744 (5th Cir. 1975) and *White v. Maggio*, 556 F.2d 1352, 1356 (5th Cir. 1977)).

[25] The State argues that because the Supreme Court has not expressly extended *Ake* to forensic experts like those at issue in this case, as a matter of law the Court of Criminal Appeals' denial of the *Ake* claim here is "reasonable," because it could not have been inconsistent with any decision of the Supreme Court. (ECF No. 32 at 79-80). (As an aside, it is notable that the expert witnesses at issue in *Hinton* were also forensic experts, yet that did not negatively impact the review of the claim there, nor did the Supreme Court even note this distinction.) The State's argument overlooks the fact that the Court of Criminal Appeals did not reach the merits of the *Ake* claim but instead found it procedurally defaulted and, accordingly, the Court is reviewing the claim *de novo,* as there is cause and prejudice to overcome the procedural default. The Court is thus is not constrained by 2254(d). *Brumfield*, 135 S. Ct. at 2282; *Wiggins*, 539 U.S. at 534.

As noted, Judge Baird found that Jimenez had been denied the resources needed to hire experts other than Dr. Kanfer.[26] The Court of Criminal Appeals did not expressly accept or reject that finding, and the finding is not inconsistent with that court's procedural bar ruling. As a result, as the case comes to this Court, there is a finding by the state habeas judge that the trial judge denied requested funding, which resulted in Jimenez being unable to adequately rebut the State's experts. These findings were not expressly adopted or rejected, and the Court of Criminal Appeals itself made no findings on the issue. Therefore, the Court must address whether the habeas trial court's factual finding underpinning Jimenez's *Ake* claim survived the appellate court's decision.

Whether a Texas state trial court's habeas factual findings survive review when the Court of Criminal Appeals reaches a different ultimate conclusion is a complicated question, and the Fifth Circuit cases deciding that issue fall on a continuum. On one end of the continuum are cases like *Craker v. Procunier*, 756 F.2d 1212 (5th Cir. 1985). In that case, the Court of Criminal Appeals did not expressly reject the trial court's fact findings, but instead concluded that relief was not available despite those facts. In those sorts of cases, the Fifth Circuit has held that the facts survive review, and are entitled to deference in the federal proceedings. On the other end are cases like *Micheaux v. Collins*, 911 F.2d 1083 (5th Cir. 1990), where the fact findings of the trial court were "directly inconsistent with" the Court of Criminal Appeals' summary denial of relief. In this sort of case, the Fifth Circuit holds that the trial court's findings do not survive review, and are not entitled to deference. In a very recent decision, the Fifth Circuit was faced with this question. *See Murphy v.*

---

[26]After the findings were transmitted to the CCA, Judge Wisser submitted an affidavit controverting some of the allegations of Mr. Martinez's affidavit. The CCA stated that "[a]lthough we could remand this case for further proceedings and consideration of Judge Wisser's affidavit, that is not necessary to our resolution of applicant's claims," because the *Ake* claim was procedurally barred. *Ex Parte Jimenez*, 364 S.W.3d at 879 n.40.

45

*Davis*, ___ F.3d ___, 2018 WL 4042362 (5th Cir. Aug. 24, 2018). The findings made by the state habeas trial court were: (1) Murphy's *Brady* claim was available at the time of his first habeas application and thus was procedurally barred, and (2) the *Brady* claim was not meritorious. After these findings were transmitted to the Court of Criminal Appeals, in a brief order it dismissed the habeas application "as an abuse of the writ without considering the merits of the claims." *Id.* at *11. The Fifth Circuit concluded both findings survived the appellate court's review, because the Court of Criminal Appeals expressly based its dismissal of the application on the trial court's first finding and the trial court's second finding was not "directly inconsistent" with the dismissal. *Id.* at *12.

Here, as in *Murphy*, the Court of Criminal Appeals did not reach the merits of the substantive claim, but instead refused the claim based on a procedural bar. The difference between this case and *Murphy* is that in *Murphy* the trial court found the *Brady* claim was both procedurally barred, and without merit, while here the trial court found the procedurally-barred *Ake* claim *did* have merit. This difference, however, does not require a different result, as the question is whether Judge Baird's factual findings on the merits of the *Ake* claim are "directly inconsistent" with the Court of Criminal Appeals' procedural bar ruling. The Fifth Circuit has held that a "trial court's factual findings are entitled to a presumption of correctness even if the state appellate court reached a different legal conclusion when applying the law to those facts." *Williams v. Quarterman*, 551 F.3d 352, 358 (5th Cir. 2008). The Fifth Circuit has said that a trial court's factual findings lack viability when the Court of Criminal Appeals either (1) expressly rejects all of the findings or (2) summarily denies an application and the findings are inconsistent with the denial of relief. *Murphy*, 2018 WL 4042362, at *11-12. Neither is the case here. Judge Baird's finding that the trial court denied Jimenez adequate funding to obtain expert witnesses is not inconsistent with the Court of Criminal Appeals' denial of

relief based on Mr. Martinez's failure to preserve this claim. Accordingly, Judge Baird's finding that the trial judge denied Jimenez sufficient expert funding, which resulted in Jimenez being unable to adequately rebut the State's experts, remains viable and is entitled to deference.[27]

Having concluded that Jimenez was denied sufficient funds to retain experts, the next question is whether this denial prevented her from building "an effective defense." *Ake*, 470 U.S. at 77. This question is essentially the same as the prejudice question addressed on Jimenez's ineffective assistance claim. Determining whether counsel's failure to preserve the *Ake* claim was prejudicial required determining whether that claim was meritorious—that is, whether the denial of funding prevented Jimenez from building an effective defense. All of which is to say, the merits of the free-standing *Ake* claim and the *Ake*-based ineffective assistance of counsel claim both rest on whether having only Dr. Kanfer as a forensic expert was sufficient for Jimenez to present an adequate defense. The undersigned has already answered that question, concluding that funding which allowed Jimenez to retain only Dr. Kanfer was not sufficient. Relying on the previous analysis, the undersigned concludes that Jimenez's *Ake* claim has merit, and she is entitled to relief on this claim.

**C.      Jimenez's Other Ineffective Assistance Claims and Cumulative Error Claim**

Jimenez's second and third claims argue (1) additional instances of alleged ineffective assistance; and (2) that the cumulative effect of the errors during her trial led to a fundamentally unfair trial, in violation of her due process rights. Given the undersigned's conclusion on the two claims addressed on their merits, the Court need not reach these additional claims at this time.

---

[27] The State does not contend these findings should be rejected, nor has it offered evidence sufficient to rebut these finding.

**D.      Actual Innocence**

Finally, Jimenez also seeks relief claiming she is actually innocent. (ECF No. 27 at 83). At this time, a freestanding claim of actual innocence is not cognizable in a section 2254 habeas action. *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013); *Reed v. Stephens*, 739 F.3d 753, 766 (5th Cir. 2014) (collecting cases). Accordingly, having concluded that Jimenez is otherwise entitled to relief, the undersigned respectfully declines to consider the merits of her actual innocence claim.

## CONCLUSION

Jimenez's trial counsel's performance was deficient and Jimenez was prejudiced by that that deficiency.  Because Jimenez was deprived of her Sixth Amendment rights to a fair trial and the effective assistance of counsel, she is entitled to federal habeas relief. Moreover, Jimenez has shown cause and prejudice sufficient to overcome the procedural default of her *Ake* claim.  Reviewing that claim, the Court concludes that Jimenez was denied the "basic tools" necessary to present an adequate and complete defense, in violation of her Fourteenth Amendment due process right to a fundamentally fair trial. Accordingly, Jimenez's conviction must be vacated and she is entitled to receive a new trial.

Any time a person stands convicted of a crime she did not commit, a significant injustice has occurred. If Ms. Jimenez is not guilty of these crimes, the injustice is particularly acute. At the time of her arrest Rosa Jimenez was only 20 years old. She had a one-year-old daughter who was still nursing. She was also seven months pregnant. She spoke minimal English, and the only family she had in the United States was her equally-young husband. The record does not reflect what happened to her baby daughter when she was arrested, or who took custody of the child she delivered in jail. But those children are now 15 and 16 years old. If in fact Jimenez is not guilty of this

offense—something both the trial and habeas judges appear to believe and for which there is much evidence—the injustice done here is indeed profound. It is this type of injustice that the Great Writ is meant to prevent, and the issuance of that writ here is well-warranted.

## RECOMMENDATION

It is, therefore, recommended that Jimenez's Application for Writ of Habeas Corpus be GRANTED, and it is further recommended the Court order the State to give Jimenez a new trial within 120 days of the final judgment in this case or release her from custody.

## CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, effective December 1, 2009, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a

constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could debate the dismissal or denial of some of Jimenez's section 2254 claims on substantive or procedural grounds, and find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El v. Cockrell*, 537 U.S. at 322 (citing *Slack*, 529 U.S. at 484). Accordingly, the Court should issue a certificate of appealability.

## OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *Battles v. United States Parole Comm' n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-153 (1985); *Douglass v. United Servs. Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996) (en banc).

SIGNED this 10th day of September, 2018.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE