# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

ROSA ESTELA OLIVERA JIMENEZ,

Petitioner,

v.

LORIE DAVIS,

Respondent.

Civ. Action NO. 1:12-CV-00373 LY

# PETITIONER'S RESPONSE TO
# OBJECTIONS TO REPORT AND RECOMMENDATION

Petitioner Rosa Estella Olvera Jimenez files this response to the Respondent's Objections to Report and Recommendation. Because Magistrate Judge Austin's Report and Recommendation ("Magistrate Report") correctly applies the law to facts supported by the record, the District Court should adopt the Report and Recommendation.[1]

All three trial-level judges charged with first-hand consideration of the evidence in Ms. Jimenez's case have now concluded that Ms. Jimenez should be granted a new trial:

> **This is the rare case in which justice and fundamental fairness require granting the petitioner a writ of habeas corpus.** The judge who presided over the trial has explicitly stated that he had "serious doubts" about the verdict and that "there is a substantial likelihood that [Jimenez] was not guilty." He also stated that his confidence in the verdict was further undermined when he became aware of the expert testimony at the state court habeas proceedings. And the experienced former Court of Criminal Appeals and state district court judge who presided over the state habeas evidentiary hearing concluded that Jimenez did not receive a fair trial, and the jury's verdict would likely have been different had the experts from the habeas hearings testified at the trial.[2]

---

[1] This request is made subject to the Objections filed by Ms. Jimenez in an abundance of caution. *See* Docket No. 43.

[2] Docket No. 39 at 1. The Respondent contends that Judge Wisser's August 28, 2012 letter to the Travis County District Attorney discussing the case is not properly before the Court and should not have been referenced in the Magistrate's Report. First, it is important to note that Judge Wisser's letter was presented

As will be discussed below, Ms. Jimenez's conviction is a miscarriage of justice, and no valid objections can be made to the Magistrate's findings of constitutional error.

**A.  The Respondent's Objections mischaracterize Ms. Jimenez's *Strickland* claim—it is not limited to the preservation of an *Ake* violation.**

The Respondent's Objections inaccurately limit the scope of Ms. Jimenez's claim of ineffective assistance of counsel by describing the claims as focused only on "failing to preserve a request for expert funding under *Ake*…."[3] Although the failure to preserve a due process claim under *Ake v. Oklahoma*, 470 U.S. 68 (1985), is one issue presented in Ms. Jimenez's petition, her ineffective assistance of counsel claim is broader than a mere failure to preserve an error for appeal. The Magistrate more fully explains the scope of Ms. Jimenez's ineffective assistance of counsel claim in the following discussion:

> there is little question that if Mr. Martinez had taken the correct procedural steps to obtain funding, or had preserved the error for reversal and remand, he would have been able to retain a "better expert" i.e. any of the physicians who testified at the habeas hearing, each of whom would have made a far more compelling case for Jimenez than Dr. Kanfer.[4]

The deficient performance raised in the *Strickland* claim is both (1) the failure to identify competent experts and make an adequate request for funding to Judge Wisser and (2) the failure to preserve error relating to any denial of expert assistance by the trial judge. [5]

By mischaracterizing Ms. Jimenez's claim as relating only to the preservation of error under *Ake*, the Respondent ignores the heart of Ms. Jimenez's ineffective assistance of counsel

---

[3]  to the state courts as part of Ms. Jimenez's successive applications for a writ of habeas corpus for which federal proceedings were stayed. *See* Docket No. 39 at 18. And regardless, none of the Magistrate's dispositive findings or legal conclusions are based on this letter.

[3]  Docket No. 42 at 2.

[4]  Docket No. 39 at 41.

[5]  The ineffective assistance of counsel claim relating to the failure to preserve an *Ake* violation is primarily relevant to the determination that there is cause to excuse the procedural default of Ms. Jimenez's substantive *Ake* claim. *See infra* Part D (discussing *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986)).

claim which mirrors the "straightforward application" of the *Strickland* ineffective assistance of counsel standard in the successful claim brought in *Hinton v. Alabama*, 571 U.S. 263 (2014). As part of her ineffective assistance of counsel claim, Ms. Jimenez alleged that her attorney, Leonard Martinez, failed to properly request and obtain adequate funding for qualified experts with clinical experience in pediatric choking—like the state habeas experts—to rebut the State's multiple doctors who had accused Ms. Jimenez of murder. *Compare* Docket No. 27 at 53 ("The central aspect of [Ms. Jimenez's] ineffective assistance of counsel claim is based on her trial counsel's failure to retain or request funds for qualified and appropriate experts.") *with Hinton*, 571 U.S. at 270 (trial counsel ineffective for failing to "seek additional funds" to hire competent and qualified expert).

### 1.   The deficient performance of Ms. Jimenez's trial counsel is the same as that in *Hinton v. Alabama*.

Martinez's testimony on this issue is contained in two affidavits. In an initial affidavit, he explained that he believed more qualified experts were needed to defend Ms. Jimenez, but that he was unable to retain these experts based on his perceived limitations on funding:

> . . . to all who have no understanding of the constraints of appointed counsel, we do not have the type of funds that give us the luxury of getting anyone we want. . . . getting funds and finding experts is no easy task. Counsel spent inordinate hours looking for experts willing to take a court appointed case. Most experts were unwilling to accept the low pay and then have to wait until the future to be paid. [6]

Martinez understood that the single medical expert he retained, Dr. Kanfer, was inadequate, but that this was all he believed he could get in a court appointed case:

> Given the limited resources that we had to work with as appointed counsel, we were lucky to have the assistance of Dr. Kanfer . . . . Counsel would have liked to have been able to afford Dr. McGeorge [a medical expert with experience in

---

[6]   Appl. Rec. 2729 [Docket No. 25–2 at 11].

pediatric choking cases], experts in biomechanical engineering, human factors research, and child development, but the willingness of people contacted to take appointed cases and the fees in the tens of thousands of dollars were beyond our limited resources.[7]

In a Supplemental Affidavit, Martinez confirmed: "as I explained in my prior affidavit, the expert assistance I had at trial was not sufficient to adequately defend Ms. Jimenez."[8] Again, he stated, "I did not think my current team was adequate to counter the State's case."[9]

Martinez further explained in his Supplemental Affidavit that the opinions offered by Jimenez's habeas experts were exactly what he needed and was asking for:

> I have reviewed the affidavits of Karen Zur, M.D. and John McCloskey, M.D. and Dr. Ophoven. These affidavits contain exactly the sort of expert testimony that I needed during the trial. The State had the benefit of calling B.G.'s treating physicians to testify that this was not an accidental choking. This included a pediatric ER doctor and a pediatric critical care doctor. I was unable to retain a doctor with a clinical practice treating injuries similar to B.G.'s to contradict these witnesses or to assist me in cross-examining the treating physicians. Without the testimony of a physician who actually treats airway obstructions and accidental choking, the jury was left to credit the unreliable opinions of these treating doctors.[10]

Martinez was unmistakably clear that Dr. Kanfer was not selected as a matter of trial strategy, but rather because he was the only expert who would accept the job with the funding limitations Martinez understood were in place.

*Hinton* also involved a claim of ineffective assistance of counsel relating to the selection of an under-qualified expert. *See* 571 U.S. at 263. The State's case against Hinton turned primarily on expert testimony that the bullets used in the murder came from Hinton's gun. *See id.* at 265. Hinton's trial counsel recognized that expert testimony was central to the case and requested

---

[7]   App. Rec. 2725 [Docket No. 25-2 at 7].

[8]   Appl. Rec. 3013–14 [Docket No. 25-3 at 110 – 111].

[9]   Appl. Rec. 3013–14 [Docket No. 25-3 at 110 – 111].

[10]   App. Rec. 3013 [Docket No. 25-3 at 110].

funding for a ballistics expert. The trial court granted Hinton $1000 for an expert and invited counsel to seek more if needed. *See id.* at 266 ("if it's necessary to go beyond that [the $1000], I may check and see if we can"). Hinton's attorney never sought additional funding and retained a ballistics expert named Andrew Payne who lacked relevant experience, but nonetheless provided an exculpatory opinion that the bullets could not be associated with Hinton's gun. *See id.* at 268.

The explanation provided by Hinton's attorney for his selection of an under-qualified expert echoes that provided by Martinez:

> Q.  You did an awful lot of work to try and find what you believed to be a qualified expert in this case, didn't you?
>
> A.  Yes, sir, I did.
>
> Q.  Would you characterize it that you did everything that you knew to do?
>
> A.  Yes, sir, I think so.
>
> Q.  And this case, did it come down to an unwillingness of experts to work for the price that you were able to pay?
>
> A.  Yes, sir, I think it did.

*Id.* at 267–68. In both cases, the trial attorney understood there to be limitations on the amount of expert funding available and hired an under-qualified expert because that exert was the only one they could find to work for such little money.

And in both cases, the trial attorney's deficient performance under the *Strickland* standard is shown by the attorney's failure to competently request expert funding. In his Supplemental Affidavit, Martinez provided a step-by-step description of his informal and legally inadequate method for requesting expert funds.[11] Martinez's cursory motions filed in the trial court

---

[11]  *See* Docket No. 39 at 32.

likewise demonstrate that he had failed to make a proper request for expert assistance.[12] In finding deficient performance, the Magistrate noted that these requests did not conform with the established Texas legal standard for requesting expert funding.[13]

The Magistrate's reasoning is identical to the United States Supreme Court's findings in *Hinton* that trial counsel performed deficiently in failing to avail himself of the resources available under the law:

> The . . . inadequate assistance of counsel here was the inexcusable mistake of law—the unreasonable failure to understand the resources that state law made available to him—that caused counsel to employ an expert that *he himself* deemed inadequate.

571 U.S. at 274. In both *Hinton* and Ms. Jimenez's case, trial counsel performed deficiently under the *Strickland* standard because they failed in their role as counsel to obtain expert funding that was actually available to them. *See id.* at 266 ("Hinton's attorney did not take the judge up on his invitation to file a request for more funding."); Affidavit of Hon. Jon Wisser[14] (Appl. Rec. 4507 [Docket No. 25-9 at 331]) (Judge Wisser was "willing to give the defense an expert to counter each of the State's expert witnesses" and would have granted additional experts had appropriate requests been made by defense counsel).

---

[12]  *See* Docket No. 39 at 32..

[13]  *See* Docket No. 39 at 32-33 (comparing Martinez's actions to standard for requesting funds under *Rey v. State*, 897 S.W.2d 333, 341 (Tex. Crim. App. 1995)).

[14]  The State filed Judge Wisser's Affidavit in the Texas Court of Criminal Appeals. *See* Appl. Rec. 4507 [Docket No. 25-9 at 331] (Affidavit attached to State's Objections to Habeas Court's Findings of Fact and Conclusions of Law). Although the Court of Criminal Appeals did not consider Judge Wisser's affidavit, state habeas proceedings are brought in the original jurisdiction of the Court of Criminal Appeals, and there is no strict prohibition on the submission of evidence directly to the Court of Criminal Appeals. As the proponent of the evidence, the State cannot now object that Ms. Jimenez "failed to develop" the testimony of Judge Wisser in state court or that his affidavit is otherwise not properly before the Court. To the extent the district court believes that the State created an unresolved factual dispute between Judge Wisser and Martinez, a federal evidentiary hearing should be held.

**2.** **The Magistrate's *Stickland* prejudice findings mirror the Supreme Court's application of the law in *Hinton*.**

The determination of prejudice in Ms. Jimenez's *Strickland* claim is likewise the same as in *Hinton*. In both cases the expert hired at trial had the appropriate minimum credentials and provided an exculpatory opinion. However, these minimally qualified experts were not persuasive. Then, during habeas proceedings, a truly qualified team of experts presented compelling evidence undermining the State's theory of guilt.

In Ms. Jimenez's case, Dr. Kanfer was an experienced forensic pathologist, but lacked any relevant clinical expertise in pediatric choking. He testified that it was possible that B.G. choked accidentally and gave mostly valid explanations supporting his opinion. However, Dr. Kanfer was predictably and badly impeached because he lacked relevant experience and training, and his testimony was otherwise marred by his emotional and profane outbursts.[15] In habeas proceedings, Mr. Jimenez presented a team of eminently qualified pediatric experts who provided a truly persuasive response to the State's case based on their extensive clinical experience.[16]

In *Hinton*, the retained ballistics expert Payne testified that the bullets which the State associated with Hinton's gun did not match each other and could not actually be associated with Hinton's gun. *See* 571 U.S. at 268. Although Payne's testimony was exculpatory to Hinton, Payne was "badly discredited" on cross examination. The State emphasized Payne's lack of relevant experience regarding tool-mark identification of handguns and landed other blows to Payne's credibility including that he had difficulty operating a microscope and that he was blind in one eye. *Id.* at 268. In habeas proceedings, Hinton presented three new ballistics

---

[15]   *See* Docket No. 39 at 7-9.

[16]   Docket No. 39 at 6 – 7.

experts who had each worked at government crime labs and had testified as tool-mark experts in hundreds of cases. *Id.* at 270. Consistent with the opinion offered by Payne at trial, these new experts testified at a habeas hearing that "they could not conclude that any of the six bullets had been fired from the Hinton revolver." *Id.*

In yet another parallel between *Hinton* and Ms. Jimenez's case, the state courts in both cases found that there was no prejudice stemming from any deficiency in trial counsel's performance relating to the experts. In *Jimenez*, the Court of Criminal Appeals found that, even though he was "outclassed and outmatched by the State's numerous experts," Dr. Kanfer reached the "same ultimate opinion" for "almost precisely the same reasons" as the habeas experts. *Ex parte Jimenez*, 364 S.W.3d 866, 887-88 (Tex. Crim. App. 2012). The court concluded that "additional defense experts would surely have been helpful, but they were not constitutionally required." *Id.* at 888. The Alabama state court similarly rejected any prejudice in *Hinton* because the defense ballistics expert at trial, Payne, was minimally qualified to offer an opinion:

> Because Payne was a qualified expert in firearms identification, even if his qualifications did not match those of the State's experts, Hinton's claim that his trial counsel was ineffective . . . is meritless.

*Hinton v. State*, 172 So. 3d 338, 347 (Ala. Crim. App. 2008). In both instances, the state courts improperly ignored the deficiencies in the defense experts so long those experts were minimally qualified to offer an opinion.

The United States Supreme Court, however, has expressly rejected this reasoning, as contrary to a "straightforward application of our ineffective-assistance-of-counsel precedents, beginning with in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." *Hinton*, 571 U.S. at 272. The presence of a minimally qualified defense expert—as required by due process under *Ake*—does not answer the question of prejudice. Where

additional resources are available to a defendant under state law in excess of the minimum due process requirements, effective counsel is obligated to avail himself of those resources:

> It is true that Payne's testimony would have done Hinton a lot of good *if the jury had believed it*. But the jury did not believe Payne. And if there is a reasonable probability that Hinton's attorney would have hired an expert who would have instilled in the jury a reasonable doubt as to Hinton's guilt had the attorney known that the statutory funding limit had been lifted, then Hinton was prejudiced by his lawyer's deficient performance and is entitled to a new trial.

*Hinton*, 571 U.S. at 275–76.[17] As in *Hinton*, Ms. Jimenez presented at a habeas hearing the testimony of several highly qualified and experienced experts which directly contradicted the State's evidence of guilt. And had this truly persuasive expert testimony been presented at trial, there is a reasonable probability that the outcome would have been different.[18]

### 3.   *Harrington v. Richter* is inapplicable because the failure to retain additional experts was not a strategic decision.

In its Objections, the Respondent argues that—despite the similarity to *Hinton*—Ms. Jimenez's case is more analogous to *Harrington v. Richter*, 562 U.S. 86 (2011), in which the Supreme Court rejected a claim of ineffective assistance of counsel arising from the failure to call an expert.[19] The State's reliance on *Richter* is misplaced because that case involved a reasonable strategic decision by the attorney not to pursue an expert; a strategy that Ms. Jimenez's trial counsel expressly disclaimed. *See* 562 U.S. at 109. In *Richter*, trial counsel was criticized for failing to present serology and blood spatter experts who would have testified that the crime scene did not line up with the State's theory of the crime. *See id.* at 96. The

---

[17]   The United States Supreme Court's opinion in *Hinton* also refutes the Respondent's contention that the Magistrate "seems to accumulate the testimony of Jimenez's state-habeas experts." Objections at 10. In *Hinton*, the United States Supreme Court did not place any limitation on its consideration of Hinton's three habeas experts. 571 U.S. at 270. And the record in Ms. Jimenez's case indicates that the trial court would have afforded her multiple experts to counter the State's experts if her lawyer had made a legally appropriate request. *See See* Appl. Rec. 4507 [Docket No. 25-9 at 331] (Affidavit of Judge Wisser).

[18]   *See* Docket No. 39 at 41.

[19]   Docket No. 42 at 22–23.

Supreme Court rejected Richter's claim of ineffective assistance of counsel noting that it would have been reasonable for trial counsel to have focused on other aspects of the case. S*ee id.* And because the contested issues relating to the blood evidence were not apparent until the middle of trial, counsel could not be faulted for failing to investigate them earlier. *See id.* at 107-08.

In contrast to the facts of *Richter*, the need for experts was not a trial surprise in Ms. Jimenez's case. Trial counsel knew from the outset that experts on pediatric choking would be central to the defense case and made some effort to investigate and present such testimony.[20] Objectively, this was the heart of the State's case. *See Ex parte Jimenez*, 364 S.W.3d at 871 (resolution of case depended primarily on expert testimony whether accidental choking was "physically impossible"). Even before trial, Ms. Jimenez's trial counsel did not think that the expert he retained—Dr. Kanfer—was adequate, but he claimed he "was forced to work within the [funding] constraints imposed by the Court."[21] Unlike *Richter¸* trial counsel's failure to present experts in Ms. Jimenez's case was based on his misapprehension of available expert funding and not a reasonable prioritization of effort in responding to the State's case.

**B.**    **The Magistrate's finding that "all the other evidence the prosecution pointed to…was not even close to enough evidence to allow a jury to find Jimenez guilty" is supported by the record.**

Ignoring the State's heavy reliance on medical experts at trial who claimed that an accidental choking was "physically impossible," *See Ex parte Jimenez*, 364 S.W.3d at 871, the Respondent now argues that "the most powerful evidence" in the case was actually the photographs of the wad of paper towel that was removed from B.G.'s airway.[22] The Respondent invites this Court to jettison the medical expert testimony in the case and, instead rely on a

---

[20]   *See* Docket No. 39 at 13-14.

[21]   Docket No. 39 at 14.

[22]   Docket No. 42 at 6.

"common sense" judgment that the wad was too large to have been accidentally ingested.[23] This revisionist claim fails for two reasons: (1) the photographs did not accurately reflect the size of the obstruction and (2) the Court is not permitted to apply lay opinion in determining a medical questions relating to the cause of pediatric choking.

First and foremost, the record at trial and in the habeas proceedings established that the photographs were not an accurate representation of how the obstruction looked when it was removed from B.G.'s airway. The EMT who removed the obstruction testified that obstruction appeared larger in the photos than how it looked when he removed it.[24] It would not be "common sense[25]" for the jury to find Ms. Jimenez guilty based on a photograph that did not accurately reflect the size of the obstruction which cause B.G.'s injury. *See Walker v. State*, No. PD-1429-14, 1430-14, 2016 WL 6092523, *14-15 (Tex. Crim. App. October 19, 2016) (evidence of injury to child insufficient where experts based opinion that defendant intentionally scalded child on unsupported speculation regarding temperature of bath water).

Furthermore, the question of whether B.G. could possibly have choked accidentally based on the size of the wad of paper towel is a medical determination of causation. "The general rule has long been that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Guevara v. Ferrer*, 247 S.W.3d 662,

---

[23] *Id.*

[24] *See* Appl. Rec. 834 [Docket No. 24-3 at 459], Appl. Rec. 851 [Docket No. 24-3 at 476]; Docket No. 27-1 at 10 (FF #39) ("Mr. Curr confirmed his prior testimony that the photos of the wad of paper towels introduced as evidence in this case did not accurately depict the object when it was removed from B.G.'s airway").

[25] The "common sense" experience of every parent is that children frequently put odd objects in their mouths. This "common sense" is confirmed by a July 2002 report studying of children's mouthing behavior indicating that a 18-21 month-old children like B.G. spends an average of 20 minutes per day placing "other objects" in their mouth. Beverly Norris and Stuart Smith, *Research into the Mouthing Behavior of Children Up to Five Years Old* (July 2002) at 22 (http://webarchive.nationalarchives.gov.uk/+/http:/www.berr.gov.uk/files/file21800.pdf). The study documented 17 instances in which children were observed mouthing "tissues/paper towels/toilet paper." *Id.* at 26. The study also discussed data from the United Kingdom showing an average of 93 cases per year of children under age 4 choking accidentally on paper or foil. *See id.* at 41.

665 (Tex. 2007). Especially where there are legitimate questions as to the reliability of even the State's *expert's* opinion that B.G. was intentionally choked based on an incorrect assumption of the size of the wad of paper towel, *see Walker*, 2016 WL 6092523 at *14–15, the jury would not be permitted to make a "common sense" judgment resolving this medical question involving issues of the capacity of the pediatric airway and the mechanics of choking.

The risk of applying a lay person's "common sense" to the highly technical question of causation in a pediatric airway obstruction, is shown in the Respondent's own objections. The Respondent cites the EMT's description of removing the wad of paper towel as evidence that it was too large an object to have been accidentally ingested.[26] Specifically, the Respondent cites testimony that there was suction holding the wad of paper towel in place and that it was difficult to pull the wad past B.G.'s teeth. Although this description of the removal sounds persuasive to a lay person, it is almost identical to habeas expert Dr. McCloskey's testimony about removing an accidentally ingested rubber ball of about the same size from a child's airway. Dr. McCloskey testified that the accidentally ingested ball was so large that it did not easily clear the child's teeth, and that he and other treating doctors "were amazed at how [the child] got this into his airway."[27] Dr. McCloskey's testimony about removing the rubber ball also mirrors that of the EMT's treatment of B.G. in describing the suction that held the obstruction in place.[28]

The Respondent's reliance on Ms. Jimenez's allegedly inconsistent statements as evidence of guilt is equally indefensible. The Respondent cites alleged inconsistencies in Ms. Jimenez's description of discovering B.G. choking: whether he was standing and then fell or whether she

---

[26]   *See* Docket No. 42 at 7.

[27]   Appl. Rec 3576 [Docket No. 25-7 at 305].

[28]   Appl. Rec. 3590 – 91 [Docket No. 25-7 at 319 – 320].

discovered him on the floor.[29] As recognized by the Magistrate, any inconsistencies in Ms. Jimenez's account of discovering B.G. are perfectly understandable in the context of her description in the immediate wake of such a traumatic event.[30] Further, these "inconsistencies" are directly addressed by the habeas experts who testified that (1) it is common for caregivers to innocently provide inconsistent descriptions of an injury[31] and (2) the inconsistency cited by the State was not the sort of inconsistency a specialist would find relevant to a determination of child abuse.[32]

The Respondent's citation to Ms. Jimenez's "near confession,"[33] is also not persuasive evidence of guilt. This reference to a "near confession" recounts a deplorable tactic utilized by an Austin Police Detective during his lengthy interrogation of Ms. Jimenez in which he implied that Ms. Jimenez would have to confess to the crime in order to see her own daughter. After B.G. was taken to the hospital, Ms. Jimenez cooperated fully with the police investigation and accompanied detectives to the Austin Police station where she was interrogated. During that time, Ms. Jimenez was given conflicting information about the whereabouts of her infant daughter—she was still nursing and had never been separated from her mother before. After several hours of interrogation, Austin Police Detective de Los Santos used Ms. Jimenez's legitimate concern to see her daughter as leverage in an effort to extract a confession:

---

[29] Docket No. 42 at 7.

[30] Docket No. 39 at 37.

[31] The Court should also note that the cited "inconsistent" description is based on a report by Officer Torres who spoke with Ms. Jimenez at the apartment in the chaotic scene immediately after Torres had unsuccessfully attempted CPR and while B.G. was still being treated by the EMT's. Torres's report indicates that, during this questioning, he had to tell Ms. Jimenez to "calm down and stop crying." Appl. Rec. 3834 [Docket No. 24-8 at 13]. Habeas experts aside, it is simply not reasonable to expect perfect consistency in every detail provided by a distraught caregiver under these extraordinary circumstances.

[32] *Id.*

[33] *See* Docket No. 42 at 7.

> You[re] right now crying because you can't take your daughter home. [B.G.'s mother] can't take her son home, because he's in the hospital . . . . I'm giving you what you want right now. But what am I giving this lady who's going to have a thousand questions. . . . you want to see your daughter . . . I'm trying to arrange that right now. That lady wants . . . to know why . . . you are the only person who can tell me why.[34]

Having been raised in a community in Mexico where it is common for police to kidnap family members in order to extract a confession, Ms. Jimenez asked Officer de Los Santos, "why did you take my little girl?" and in a desperate attempt to be reunited with her daughter, suggested "If I . . . were to tell you . . . that I did it. . . what would happen?"[35] After she was permitted a brief opportunity to see, but not hold, her daughter Ms. Jimenez did not confess to the crime. When asked to confess by Officer de Los Santos, she responded "I can't."[36] This reprehensible episode in which a police officer attempted to use Ms. Jimenez's daughter as leverage to extract a confession is only evidence of a bad faith investigation, and not of Ms. Jimenez's guilt.

## C.    The habeas experts' opinions were not cumulative of the opinion offered by Dr. Kanfer.

The Respondent's Objections rely heavily on an unreasonable holding by the CCA which rejected Ms. Jimenez's ineffective assistance claim because "she has not shown how [the habeas experts'] testimony would be significantly different or more persuasive than was Dr. Kanfer's. They reached the same ultimate opinion as Dr. Kanfer and for almost precisely the same reasons."[37] But the Magistrate's Report correctly concludes that this determination "is clearly and convincingly rebutted by the record" noting that reaching the same "'ultimate' conclusion .

---

[34]   Appl. Rec. 2414-15 [Docket No. 24-16 at 143].

[35]   Appl Rec. at 2457-58 [Docket No. 241-16 at 188-89].

[36]   Appl. Rec. 2452 [Docket No. 24-16 at 183].

[37]   Docket No. 42 at 8.

. . alone does not create an equivalence of reasoning or persuasiveness."[38] The Respondent objects, arguing that if "the experts came to the same conclusions, then Jimenez did not carry her burden by clear and convincing evidence."[39] But this ignores *Hinton* and critical differences between the testimony of Kanfer and the habeas experts.

The contested issue at trial was whether the choking was accidental.[40] Given the State's theory (i.e., it was *impossible* for BG to have done it himself), expert testimony was absolutely essential to put on an effective defense. As the Magistrate's report explains:

> **An unqualified expert testifying to a fact is not the same** as a having a thoroughly competent expert testify to the same fact. The expert's training, experience, and education matter greatly. To conclude that, because Dr. Kanfer opined that the choking was an accident, the jury would not have reached a different conclusion had it heard from Drs. McCloskey, Zur, Ophoven, and Dunham opine that the choking was an accident, is wholly unreasonable in light of the record.[41]

The CCA's "statement that these four experts would have testified to the same opinion as Dr. Kanfer 'for almost precisely the same reason' is completely unreasonable in light of the records, as are its findings that the habeas experts' opinions were not 'new' or 'materially different' than those of Dr. Kanfer."[42] The Magistrate found that these "findings wholly disregard key aspects of the record" and that the habeas experts' "opinions were both substantively 'new' and materially different, because the habeas experts based their testimony on their clinical experience, rather than conducting an 'experiment' with a toilet paper tube."[43] Indeed, while the

---

[38]  Docket No. 39 at 25.

[39]  Docket No. 42 at 8 (quoting *Ex parte Jimenez*, 364 S.W.3d at 888)

[40]  *See Ex parte Jimenez*, 364 S.W.3d at 871 (resolution of case depended primarily on expert testimony whether BG could have choked accidentally).

[41]  Docket No. 39 at 25.

[42]  Docket No. 39 at 27 (quoting *Ex Parte Jimenez*, 364 S.W.3d at 875, 888).

[43]  Docket No. 39 at 27 (citing Docket No. 24–7 at 52-53). Judge Austin cited the following exchange from Dr. Kanfer's direct examination:

CCA recognized that "the habeas experts' opinions were based on 'scientific methodology' and 'were supported by scientific data,'" it made "no similar conclusion regarding Dr. Kanfer's testimony. Nor could it, as his conclusions were supported by his own impromptu experiment saturating and wadding-up paper towels and stuffing them through a toilet paper tube, and he had no relevant clinical experience whatsoever."[44]

The Magistrate found that the "material differences between Dr. Kanfer's testimony and the testimony of the habeas experts are too many to list."[45] This is correct: the habeas experts offered new and materially different testimony that was credible and articulated exactly how BG could have choked on the paper towels, providing real-life examples of children choking on similar sized objects. This testimony effectively counters the testimony of the State's experts and is testimony that Dr. Kanfer could not and did not offer at trial.[46]

---

Q: [W]hat we did was basically just . . . you got the wad and got – made sure it was saturated, and then checked whether it could easily fall through the opening of a toilet paper roll, correct?

A: Right.

Q: Went in without any problem whatsoever?

A: Yes. It dropped right through.

Q: Okay. And then we took – as it dropped right through, we took it – picked it up and just laid it on top of the table, correct?

A: Right.

Q: And we came back to that – about 45 minutes to an hour later we came back to it.

Ms. Wetzlel: Your Honor, excuse me. Again I object to the defense attorney testifying. If he wants to testify, he needs to be sworn in and be a witness.

Mr. Martinez: I understand. I'll rephrase the question, Your Honor.

The Court: Okay, we'll sustain the objection.

Docket No. 24-7 at 52-53.

[44]   Docket No. 39 at 28 (quoting *Ex parte Jimenez*, 364 S.W.3d at 874).

[45]   Docket No. 39 at 28.

[46]   Appl. Rec. 844, Trial Trans. Vol. 3 (Cross-exam of R. Curr) [Docket No. 24-3 at 469]; Appl. Rec. 891, Trial Trans. Vol. 3 (Cross-exam of Dr. Boulet) [Docket No. 24-3 at 516]; Appl. Rec. 1316, Trial Trans. Vol. 7 (Kanfer Voir Dire) [Docket No. 24-7 at 16]; Appl. Rec. 1329 – 30, Trial Trans. Vol. 7 (Kanfer Direct) [Docket No. 24-7 at 29]; Appl. Rec. 190 1494 – 94, Trial Trans. Vol. 7 (Dr. Alexander Direct) [Docket No. 24-7 at 194 – 95].

Both Dr. McCloskey and Dr. Zur testified that they did not believe the choking could have been intentional "because of the lack of any significant injury to B.G. or Jimenez."[47] The Magistrate recognized that—in addition to being board-certified in pediatrics and pediatric critical care—"Dr. McCloskey compared this case to other patients he had treated where he knew (from a confession or other evidence) that someone had intentionally shoved a large object into a child's mouth[,]"[48] and that "in those cases exhibited injuries to the child that were not found on B.G."[49] Because of this "first-hand experience in treating both accidental choking cases and similar instances of child abuse[,]" Dr. McCloskey had "a unique perspective on the evidence that lends additional credibility to his opinions regarding this injury."[50]

Dr. Zur's testimony also refuted the testimony offered by Dr. Oerhring/Aldridge at trial that the paper towels would have had to have been lodged into a space the size of a quarter, would have taken significant force to lodge the paper towels into that place, and BG would not have had the strength or dexterity to have pushed the paper towels back into his airway.[51] Although Dr. Oehring/Aldridge's testimony sounds convincing, it is incorrect and inconsistent with the facts of BG's injury and the anatomy of a child BG's age,[52] but Dr. Kanfer was unable to refute this testimony from the stand because he lacked expertise in child development and pediatrics. Drs. Zur and McCloskey, on the other hand, quickly proved that the State's experts provided false and inaccurate testimony.[53]

---

[47]  Docket No. 39 at 28 – 29 (citing Docket No. 25-7 at 415-17, 421 and Docket No. 25-3 at 75, 82).

[48]  Docket No. 39 at 28 (citing Docket No. 25-7 at 306-07, 383, 392, 415-16, 421).

[49]  Docket No. 39 at 28 (citing Docket No. 25-7 at 306-07, 314-16, 383, 416-17, 421, 425).

[50]  Docket No. 39 at 28 (citing Docket No. No. 25-6 at 57).

[51]  Appl. Rec. 1161, Trial Trans. Vol. 5 (Direct Exam of Oehring/Aldridge) [Docket No. 24-5 at 84].

[52]  Appl. Rec. 3346, Habeas Trans. Vol. 2 (Direct Exam of Dr. Zur) [Docket No. 25-7 at 75].

[53]  Appl. Rec. 3346, Habeas Trans. Vol. 2 (Direct Exam of Dr. Zur) [Docket No. 25-7 at 75].

Judge Austin also points out that the CCA "never mentions Dr. Dunham's statements at all, completely overlooking the fact that he had personal experience with a child who had accidentally choked on a piece of bread possibly wider than the wad of paper towels found in B.G.'s airway."[54] Dr. Dunham's account is notable not simply because it disproves that State's reliance on the size of the obstruction, but also because the child treated by Dr. Dunham exhibited the same symptoms of intermittent breathing and eye rolling that were reported by Irene Vera on the 911 call while administering aid to BG.[55]

The habeas experts were also able to refute the state's expert Dr. Alexander, who testified that inconsistencies in Jimenez's description of the choking incident was evidence of child abuse.[56] Indeed, Dr. McCloskey would have testified that that it is common for there to be inconsistencies in medical histories provided by lay persons and that an inconsistency such as the one identified by the state—whether B.G. was standing when Jimenez discovered him choking—is not the sort that specialists would find relevant to a child abuse determination.[57]

Other issues regarding Dr. Alexander's credibility arose during the habeas hearing. Dr. Alexander submitted an affidavit in which he purported to give an example of an intentional choking of a child in which there were no apparent injuries.[58] But Dr. Alexander's affidavit testimony was proven false when another of the State's experts reviewed the autopsy report from that case and confirmed during her habeas testimony obvious and substantial injuries to

---

[54] Docket No. 39 at 27.

[55] Appl. Rec. 3189 (Dunham Affidavit) [Docket No. 25-5 at 92]; Appl. Rec. 3256 (FOF 20) [Docket No. 25-6 at 55]; Appl. Rec. 3575, Habeas Trans. Vol. 4 (Direct Exam of Dr. McCloskey) [Docket No. 25-7 at 304].

[56] Docket No. 39 at 37.

[57] Docket No. 39 at 37 (citing Docket No. 25-7 at 163-64, 353-54, 358-59).

[58] *See* Appl. Rec. 3869 [Docket No. 25-8 at 48] (Alexander referring to "a Texas case where a step-mother forced a taco into a child's throat and killed her without such injuries").

the child's head and face sustained during the attack.[59]  Throughout these proceedings, the State has never provided a single example of the intentional choking of a child B.G.'s age in which there was no apparent injury to the child.

Judge Austin's analysis of the differences between the opinions of Kanfer and the habeas experts also recognized that the CCA:

> fails to account for the fact that Dr. Kanfer approached the prosecutors during a recess and told them they "could go fuck themselves," something the jury heard repeated *four* times. Ignoring the impact this statement had on the weight the jury placed on Dr. Kanfer's opinions when it was analyzing whether the result would not have been different if the jury had heard the testimony of the habeas experts rather than Dr. Kanfer was a completely unreasonable determination and is not fairly supported by the record.[60]

The CCA found that Jimenez's "defense 'cogently, coherently, and completely' presented, through 'medical evidence,' the 'defensive theory' that B.G.'s demise was the result of a 'self-inflicted accidental death.'"[61] In light of the substantial differences in the testimony offered by Dr. Kanfer and the habeas experts, Judge Austin is correct that this "factual finding simply ignores the trial record."[62] Indeed, the CCA's conclusion that Jimenez was not prejudiced by the absence of credible and qualified experts is directly contradicted the repeated and undisturbed findings of the habeas judge[63] and the CCA's own statements:

---

[59]  *See* Appl. Rec. 3835 – 38 [Docket No. 25-8 at 14] (Medical Examiner Report reflecting other injuries to child Alexander references); Appl. Rec. 3748 – 52 [Docket No. 25-7 at 477 – 81] (Dr. Peacock testifying on cross-examination regarding the other injuries to the child in the case Alexander references).

[60]  Docket No. 39 at 30. The Habeas Court found that: "to the extent Dr. Kanfer's testimony had any persuasive value (which is highly doubtful), … it was completely and 100% undermined by Dr. Kanfer's unprofessional conduct at trial." The CCA did not disturb this factual finding. Appl. Rec. 3263 (FOF 62) [Docket No. 25-6 at 62].

[61]  Docket No. 39 at 29 (citing *Ex parte Jimenez* at 874, 888).

[62]  Docket No. 39 at 29.

[63]  Appl. Rec. 3265 – 66 (COL 6) [Docket No. 25-6 at 64].

"Dr. Zur's credentials demonstrated that she is **one of the most qualified persons in the nation to give an opinion in this case**"[64]

and

"Dr. McCloskey's credentials as [a] researcher and clinician . . . as well as his first-hand experience in treating both accidental choking cases and similar instances of child abuse give him a unique perspective on the evidence that lends additional credibility to his opinions regarding this injury."[65]

The Magistrate's report reaches the only conclusion supported by the habeas record: "It is simply not plausible to conclude that a jury who heard the testimony of the experts presented at the habeas proceeding would have returned the same verdict as a jury who only heard Dr. Kanfer."[66] And as a result:

> **This case is on all fours with *Hinton*.** Mr. Martinez has said that the experts' testimony at the habeas hearing was "exactly the sort of testimony that I needed during the trial," but he did not have the resources to obtain these experts. (ECF No. 25-3 at 110). And although Dr. Kanfer testified consistently with the defense theory, on cross examination he was "badly discredited," and not only because of his unprofessional actions, but also because of his lax preparation and his lack of relevant clinical experience or pediatric airway training. Most critically, **the *Hinton* Court directly rejects the very analysis the Court of Criminal Appeals employed to conclude that Jimenez was not prejudiced by her counsel's failure to preserve error on the expert funding issue.** Simply determining that the trial expert testified to the same opinions as the more qualified habeas experts is not enough to determine if there has been prejudice. Instead, the correct rule is "if there is a reasonable probability that [the defendant's] attorney would have hired an expert who would have instilled in the jury areasonable doubt as to [the defendant's] guilt had the attorney [not been deficient], then [the defendant] was prejudiced by his lawyer's deficient performance . . ." *Hinton*, 571 U.S. at 276.

---

[64]   Appl. Rec. 4188 (COA Opinion) [Docket No. 25-9 at 12]; *accord* Appl. Rec. 3255 (FOF 15) [Docket No. 25-6 at 54].

[65]   Appl. Rec. 4188 (COA Opinion) [Docket No. 25-9 at 12]; *accord* Appl. Rec. 3258 (FOF 29) [Docket No. 25-6 at 57].

[66]   Docket No. 39 at 30 (emphasis added) (quoting Docket No. 25-9 at 333).

Applying that rule here, there is little question that if Mr. Martinez had taken the correct procedural steps to obtain funding, or had preserved the error for reversal and remand, he would have been able to retain a "better expert," i.e., any of the physicians who testified at the habeas hearing, each of whom would have made a far more compelling case for Jimenez than Dr. Kanfer.[67]

## D.   Martinez's ineffectiveness is cause for merits consideration of the *Ake* claim.

The Respondent contends that the Magistrate should not have considered Ms. Jimenez's *Ake* claim because it was procedurally defaulted. And while it is correct that the Texas Court of Criminal Appeals declined to consider the claim on procedural grounds, the Magistrate rightly found that there was cause to excuse the default.  In reaching the merits of Ms. Jimenez's *Ake* claim, the Magistrate relied on the Supreme Court's longstanding precedent in *Murray v. Carrier*, which holds that the ineffective assistance of trial counsel constitutes cause for the procedural default of a claim.477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986). Because the Magistrate determined that Ms. Jimenez's trial counsel was ineffective in failing to preserve Ms. Jimenez's *Ake* claim by filing proper motions for expert assistance, there was cause for the default.[68] The Respondent does not cite or distinguish *Murray*, which is controlling precedent on this issue.

## E.   Ms. Jimenez's Ake claim is not *Teague*-barred.

The Respondent also objects to the Magistrate's consideration of the *Ake* claim, claiming that the application of *Ake v. Oklahoma* to medical experts violates the *Teague* non-retroactivity doctrine. Under *Teague v. Lane*, 489 U.S. 288 (1989), the United States Supreme Court held that a new rule of constitutional law may not be applied retroactively in federal habeas to convictions which were final prior to the enactment of the new rule. Taking a narrow view of the United States Supreme Court's opinion in *Ake*, the Respondent contends that the due

---

[67]   *Id.* at 40 − 41 (emphasis added).

[68]   *Id.*

process right to expert assistance only applies to psychiatric experts, and not the medical experts at issue in Ms. Jimenez's case.[69] This purported limitation cannot be found in the *Ake* decision itself and would run counter to the United States Supreme Court's precedent in determining what constitutes a "new rule."

First, it is doubtful that the Respondent's suggested limitation on the scope of experts to be afforded under *Ake* exists because the Supreme Court's opinion in *Ake* itself was not announcing a "new rule." The Supreme Court makes no mention of expanding the scope of due process in its opinion in *Ake*. Instead, the Court explained that it was applying a well-established line of cases in which due process requires that indigent criminal defendants such as Ms. Jimenez be afforded the "basic tools of an adequate defense." *Ake*, 470 U.S. at 77. The test, and its roots in prior due process jurisprudence, were plainly stated as follows:

> fundamental fairness entitles indigent defendants to "an adequate opportunity to present their claims fairly within the adversary system," *id.*, at 612, 94 S.Ct., at 2444. **To implement this principle, we have focused on identifying the "basic tools of an adequate defense or appeal,"** *Britt v. North Carolina*, 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971), **and we have required that such tools be provided to those defendants who cannot afford to pay for them.**

*Id.* (emphasis added). Again citing prior authority, the Court applied the three-part *Mathews v. Eldridge*, 424 U.S. 319 (1976), test to determine whether due process was violated. *See id.* (citing *Little v. Streater*, 452 U.S. 1 (1981)). There was nothing special regarding the confines of the due process clause about the need for a psychiatric expert raised in *Ake*; the Court was simply considering whether such assistance was a "basic tool" required for an adequate defense under the due process clause.

---

[69]   *See* Docket No. 42 at 27.

The Supreme Court's citation to its prior application of the due process clause in *Little v. Streater* is particularly informative because that case had already established that the due process right to an expert was not limited to the issue of sanity. In *Little*, an indigent defendant in a paternity suit argued that due process was violated when he was denied expert funding for a blood test which could resolve the question. *Little*, 452 U.S. at 4. As in *Ake*, the Court applied the three-part *Mathews v. Eldridge* standard and determined that due process required that the State afford such testing. *See id.* at 16 (absent funding for blood test, defendant lacked a meaningful opportunity to be heard).

Fifth Circuit authority also demonstrates that *Ake*'s holding that due process requires access to expert assistance as part of the "basic tools of an adequate defense" was neither new or limited to psychiatric experts. In a case decided a decade before *Ake*, the Fifth Circuit held that due process required a Louisiana state court to afford an expert examination of ballistics evidence. *See Barnard v. Henderson*, 514 F.2d 744, 746-47 (5th Cir. 1975). Echoing the future holding of the Supreme Court in *Ake*, Fifth Circuit's clearly stated:

> Fundamental fairness is violated when a criminal defendant on trial for his liberty is denied the opportunity to have an expert of his choosing, bound by appropriate safeguards imposed by the Court, examine a piece of critical evidence whose nature is subject to varying expert opinion.

*Id.* at 746. Where the same due process principles articulated in *Ake* are applied in prior cases to require access to non-psychiatric experts, the Magistrate was correct in rejecting the Respondent's *Teague* bar contention.

And even if *Ake* did articulate a "new rule" as defined by *Teague*, Ms. Jimenez's application of that rule to her request for medical experts does not violate the non-retroactivity principle because both the Texas courts and the Fifth Circuit applied *Ake* outside the context of psychiatric experts prior to when Ms. Jimenez's conviction became final. In *O'Dell v.*

*Netherland*, 521 U.S. 151 (1997), the Supreme Court provided guidance in distinguishing between (1) the application of existing constitutional precedent and (2) the extension of that precedent which would constitute a "new rule." The relevant standard in applying *Teague* to Ms. Jimenez's *Ake* claim is stated as follows:

> the habeas court considers whether "a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution."

*Id.* at 156 (quoting *Lambrix v. Singletary*, 520 U.S. 518, 527 (1997)). Examining both Texas and Fifth Circuit precedent, there is no question that courts "felt compelled" to conclude that the Due Process Clause requires defendants be afforded access to non-psychiatric experts long before Ms. Jimenez's conviction became final.

In *Rey v. State*, 897 S.W. 2d 333 (Tex. Crim. App. 1995) —a case decided ten years before Ms. Jimenez's trial—the Texas Court of Criminal Appeals expressly rejected the Respondent's argument that the holding of *Ake* was limited to psychiatric experts. *See Rey*, 897 S.W.2d at 338–39. In holding that *Ake* was not so limited, the Texas Court of Criminal Appeals quoted and adopted an earlier Eighth Circuit decision:

> There is no principled way to distinguish between psychiatric and nonpsychiatric experts. The question in each case must be not what field of expert knowledge is involved, but rather how important the scientific issue is in the case, and how much help a defense expert could have given.

*Id.* at 338 (quoting *Little v. Armontrout*, 835 F.2d 1240, 1243 (8th Cir. 1995)). Accordingly, the Texas courts "felt compelled" to conclude that the constitutional principles articulated in *Ake* were not limited to psychiatric experts.

Moreover, the Fifth Circuit has also "felt compelled" to apply the requirements of *Ake* to non-psychiatric experts long before Ms. Jimenez's conviction became final. In *Yohey v. Collins*,

985 F.2d 222 (5th Cir. 1993), the court cited both its own prior precedent and the Supreme

Court's opinions in *Ake* and *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985), in holding that:

> non-psychiatric experts, such as ballistic experts, should be provided only if the evidence is "both 'critical' to the conviction and subject to varying expert opinion.

*Yohey*, 985 F.2d at 227. It is again worth noting that the Fifth Circuit's due process

jurisprudence requiring access to non-psychiatric experts predates even *Ake. See Barnard*, 514

F.2d at 746; *White v. Maggio*, 556 F.2d 1352, 1356 (5th Cir. 1977) (applying *Barnard*

retroactively). Where both the Texas Court of Criminal Appeals and the Fifth Circuit have

applied *Ake* to non-psychiatric experts prior to Ms. Jimenez's trial, *Teague* does not bar

consideration of the merits of Ms. Jimenez's *Ake* claim.

### F.    Due process under *Ake* does not limit the defense to a single expert.

Many of the Respondent's Objections are premised on the legally incorrect assertion that

due process only required the State to provide a single expert to Ms. Jimenez.[70] To the extent

this argument is made as part of an objection to the recommendation of relief for ineffective

assistance of counsel, any purported limitation dictated by due process is irrelevant. The

question of ineffective assistance of counsel focuses on what resources were available *under state

law* and whether trial counsel's performance was deficient in failing to access those resources.

*See supra* Part A (discussing *Hinton v. Alabama*). And the record in Ms. Jimenez's case shows

that additional experts were available had an adequate request been made.[71] Furthermore, the

Respondent's discussion of due process law under *Ake* admits that a defendant may be entitled

to multiple experts where the additional experts are "not cumulative of other readily available

---

[70]    *See, e.g.,* Docket No. 42 at 10, 16-17.

[71]    *See See* Appl. Rec. 4507 [Docket No. 25-9 at 331] (Affidavit of Judge Wisser).

witnesses."[72] As discussed at length *supra* Part C, the habeas experts possessed both expertise and first-hand experience in the field of treating pediatric airway obstructions that were not cumulative of the trial expert Dr. Kanfer. Any finding to the contrary by the Texas Court of Criminal Appeals was unreasonable and inconsistent with the state habeas record.

## Conclusion and Prayer

The Magistrate's Report represents a careful and comprehensive review of the highly-technical factual record and the clear legal authority supporting the relief recommended. Accordingly, the Respondent's Objections should be overruled and the Report adopted in its entirety.

Date: November 5, 2018                         Respectfully submitted,

                                               */s/ Bryce Benjet*
                                               Bryce Benjet, State Bar No. 24006829
                                               40 Worth Street, Ste. 701
                                               New York, NY 10013
                                               Telephone: 212.364.5980
                                               Facsimile: 212.364.5341

                                               Joanne Early, Bar No. 06346500
                                               Rachel Kingrey O'Neil, Bar No. 24068616
                                               Sara Ann Brown, Bar No. 24075773
                                               FOLEY GARDERE
                                               Foley & Lardner LLP
                                               2100 McKinney Ave., Suite 1600
                                               Dallas, Texas 75201
                                               Telephone: 214.999.3000
                                               Facsimile: 214.999.4667
                                               jearly@foley.com
                                               rkoneil@foley.com
                                               sabrown@foley.com

                                               **Counsel for Rosa Estela Olvera Jimenez**

---

[72]   Docket No. 42 at 16.

## Certificate of Service

I certify that the forgoing will be electronically filed on November 5, 2018, using the CM/ECF system, which will send a notice of such filing on all parties registered to receive such service, including counsel of record for the Respondent.

/s/ Sara Ann Brown
Sara Ann Brown